Argued April 12, affirmed July 31, 1956

SMITH *v.* OWEN ET AL

300 P. 2d 423

*Frank P. Santos,* Oregon City, argued the cause for appellants. On the briefs was Glenn R. Jack, Oregon City.

*Patrick E. Dooley,* Portland, argued the cause and filed a brief for respondent.

Before WARNER, Chief Justice, and TOOZE, ROSSMAN, LUSK, BRAND and PERRY, Justices.

LUSK, J.

This is an action on a promissory note in which judgment was recovered by the plaintiff after a jury trial and the defendants have appealed.

The note is dated June 28, 1951, is in the principal sum of $12,772.50, is made payable in five installments to the National Bank of Commerce of Seattle at its Yakima Branch in Yakima, Washington, contains an acceleration clause, and was signed by "Earl Owen, Partner," under the words "Earl Owen and Leonard Wormdahl, Partners." Execution of the note grew out of the purchase by the defendants from Central Chain and Transmission Company, a

Washington corporation, hereinafter called the Central Chain, having an office in Yakima, Washington, of a "Vertical Hop Picking Machine." An installment contract covering the sale of the machine was executed by Central Machine and defendants under date of February 25, 1950. The machine was used jointly by the defendants on their hop farms in Clackamas county.

At the time of the execution of the note the defendants were apparently in default under their contract and the principal amount of the note was the amount of the then existing obligation under the contract. The note was made payable to the National Bank of Commerce of Seattle as part of an arrangement for financing Central Chain. It is unnecessary to state the details of that transaction. It is sufficient to say that eventually Central Chain was required to pay the full amount of the note of which it became the owner and which it assigned to the plaintiff for collection.

There is no dispute about the fact that defendants have paid nothing on the note.

■ The first assignment of error is directed to the court's denials of motions for a nonsuit and directed verdict submitted on behalf of the defendant Wormdahl and based on the ground that that defendant did not execute the note nor authorize or ratify its execution by his codefendant Owen. The short answer to this contention is that it is alleged by the defendants in their Third and Separate Answer on which the case was tried that on or about the 1st day of June, 1951, "the defendants executed a note, which note is the note set forth in plaintiff's complaint." Besides, there is ample evidence that defendants were joint adventurers in the purchase, ownership and use

of the hop picking machine and that Owen was authorized to execute the note on behalf of the partnership and that subsequently Wormdahl ratified its execution. It was not necessary for Wormdahl's signature to have appeared on the note if Owen was authorized to act for the partnership in its execution. ORS 71.019; and see ORS 68.210 with reference to a partner as agent for the partnership business.

After the motion for directed verdict on behalf of the defendant Wormdahl was made the plaintiff moved for a directed verdict against such defendant, thus submitting to the court all the issues between those parties. The court thereafter determined those issues in favor of the plaintiff. The only submission to the jury, therefore, was as to the liability of the defendant Owen and the remaining two assignments of error are made on behalf of that defendant alone.

Counsel for defendant Owen requested the court to instruct the jury that they could not find for the plaintiff in an amount greater than the amount due on the note prior to the date of filing the complaint. The court, instead, instructed that if the jury found for the plaintiff he was entitled to recover the full amount of the principal, $12,772.50, together with interest at the rate of eight per cent per annum from the 27th day of May, 1953. In other words, the court by this instruction gave effect to the acceleration clause in the note. This is asserted to be error because, it is said, there is no evidence that the holder of the note ever exercised the option therein given to declare the whole amount unpaid "due and immediately payable" after a default. Institution of the action was all that was required for the exercise of the option. *Reid v. Wentworth & Irwin,* 155 Or 265, 272, 63 P2d 210; *Harrison v. Beals,* 111 Or 563, 578,

222 P 728. There is nothing to the contrary in *Buckman v. Hill Military Academy*, 182 Or 621, 189 P2d 575, cited in the defendants' brief. The assignment of error is without merit.

The remaining assignment of error challenges the propriety of the court's action in withdrawing from the jury's consideration certain allegations of the affirmative answer. The answer alleged: "That at the time of signing said note, the defendants, and each of them, relied upon" certain knowingly false representations made by the agents and employees of Central Chain, and "said representations were made by said agents and employees at said time for the sole purpose of inducing defendants to sign said note." We quote paragraphs III, IV and V of the amended answer, italicizing the portions thereof withdrawn by the court:

"III. That the representations made by the said Central Chain and Transmission Company were that the said hop picking machine which the defendants had agreed to purchase the season prior thereto would be repaired and rebuilt in an efficient manner so that said hop picking machine as repaired and rebuilt would:

(a) Pick hops efficiently and economically in such a manner as to get the maximum hops from the vines.

(b) *Said machine was better than any competing brand of hop picking machine.*

(c) *Said machine would pick hops for a total picking cost of not to exceed 1½¢ to 2¢ per pound green weight.*

(d) *That said machine was well constructed and would pick hops efficiently and faster than any competing machine.*

"IV. That thereafter the said Central Chain and Transmission Company refused to make any adequate repairs or alterations to said machine,

and refused to rebuild said machine in a manner that the said machine would operate efficiently in accordance with said representations and promises, and said machine was a defective piece of machinery and equipment to the extent that the defendants have been seriously damaged in endeavoring to rebuild, repair, maintain and operate the same.

"V. That defendants discovered that said machine did not conform to the representations made by the Central Chain and Transmission Company in that:

(a) Said machine would not pick hops efficiently, nor would it get the maximum amount of hops from the vines in good order and condition, and said defendants, and each of them, lost a large portion of the hop crop.

(b) *Said machine would not operate more efficiently than other competitive brands of hop picking machines.*

(c) *Said machine would not pick hops at a cost indicated by said Central Chain and Transmission Company.*

(d) That said machine was continually breaking down as a result of defective equipment."

A brief statement of some additional facts will aid in an understanding of the question raised by this assignment of error. The machine was delivered to the defendants in late June or early July of 1950 and was used by them in harvesting their 1950 hop crops. Due, apparently, to mechanical defects the machine did not work satisfactorily and as a result of complaints made by the defendants, Central Chain, through its manager, C. G. Danberg, agreed to make certain repairs, alterations and improvements before the commencement of the 1951 hop picking season. This work was completed within the agreed time at a cost of $7,000 to Central Chain. According to the defendants' testimony, they still had trouble with

the machine, notwithstanding the improvements. There were frequent breakdowns which caused them loss. Whether these were due to defects in the machine or inefficiency in its operation, the record leaves somewhat dubious. But the defendants never offered to return the machine (although they allege in their answer that they "have at all times desired to surrender said machine"). On the contrary, on October 18, 1951, being in default and pressed for payment by the bank, they went to Yakima and there signed a so-called "Revision and Extension Agreement" by which the terms of payment as stipulated in the note were changed. This agreement, which is on a printed form, refers, not to the note, but to "my contract." But there can be no doubt that it was the intention of the parties that it should modify the terms of the note; for not only was the agreement signed by Central Chain and the defendants, but also by the bank and by Time Finance Company which, shortly after the note was executed, purchased it from Central Chain and endorsed and delivered it to the bank as collateral for a loan. Neither the bank nor Time Finance Company had any interest in the contract, but they did have in the note.

■ Returning now to the alleged error of the court in withdrawing the allegations of fraudulent misrepresentations by Central Chain, there are several reasons why the court's ruling must be sustained. Subsection (c) of paragraph III was properly withdrawn because there was no evidence that Central Chain had represented that the machine would pick hops for a total picking cost of not to exceed one and one-half cents to two cents per pound green weight. The representations set forth in subsections (b) and (c) of paragraph III that the machine was better than

any competing brand of hop picking machine and was well constructed and would pick hops efficiently and faster than any competing machine, it might well be contended, were mere expressions of opinion rather than representations of fact. See *Horner v. Wagy,* 173 Or 441, 455, 146 P2d 292. But putting that to one side, the evidence would not justify a finding that the representations, whatever they may have been, were made fraudulently or for the purpose of inducing the execution of the note. They were made by Mr. Danberg in November, 1951, at a meeting in Mt. Angel, attended not only by the defendants but also by others who had purchased machines from Central Chain. This was some eight months before the note was signed and there is not the slightest suggestion in the record that at that time Mr. Danberg had any intention of asking the defendants to execute a note to take the place of the existing contract. The circumstances under which the note was obtained were thus explained by Mr. Danberg in his testimony: The defendants were behind in their payments. He went to see Owen about it and the latter stated that the defendants were unable to meet the terms of the contract and it was decided then to draw up the note with new terms of payment more convenient to the defendants; further, that Central Chain had to have money to operate on and Danberg informed Owen that he was going to sell the note in order to raise money. This testimony stands uncontradicted, save for testimony by the defendant Owen that an extension of time on a payment of $5,200.00 had been previously granted, and they were not in default. The defendant Owen was asked on direct examination to state what was said at this time respecting the im-

provements in the machine which had been promised at the Mt. Angel meeting. He answered:

"* * * The changes had not been made yet, and we were assuming that the machine would work successfully and to the expectations that we had went into it with on the agreement in November of the latter part of the year after picking in 1950. So assuming when signing that note, we were expecting the machine to work to our advantage satisfactorily and also economically, as far as we were concerned.

"Q And did you tell Mr. Danberg that? A I did.

"Q And did Mr. Danberg make any response to that as to whether or not those changes would be made? A I believe at that time, as near as I can recall, that he was pretty much assured that it would, too.

"Q And that is the reason you signed that note? A That's the reason."

But on cross-examination he testified that it was not necessary for anything to have been said about changes in the machine at the time the note was signed, because the changes previously had been outlined in a letter of Mr. Danberg's, "and this note didn't have no bearing on it, as I told you before." He further testified on cross-examination:

"Q And he [Danberg] didn't tell you it would operate successfully at the time that you signed the note, did he? A He probably didn't, no."

He twice testified that Danberg stated at the Mt. Angel meeting that "the machine would, *as near as they could tell*, operate successfully according to competitive machines." (Italics added) He admitted that Danberg did not guarantee that the machine would work.

The sum of the matter is that the evidence shows some representations respecting the results that it was anticipated would be achieved by repairing the machine, which were entirely unrelated to the note sued upon. Even though fraudulent, proof of them would not sustain the allegations of the answer that they were made to induce the defendants to execute the note and that defendants relied on them when they executed the note. Quite apart from the fact that it is not actionable fraud for one to predict that a machine will operate successfully "as near as they could tell", even though the prediction is never fulfilled, there is nothing in the present record which would justify a finding that either this or any of the other statements made by Danberg respecting the efficient and economical operation of the machine after it should be rebuilt were made with intent to defraud. Rather, the only reasonable conclusion from the evidence is that these assurances were given in good faith. Central Chain manifested its own confidence in the outcome by spending $7,000.00 in rebuilding a machine which it had sold for $18,000.00. This must have been the jury's view of the case, for the court submitted the issue as to whether Central Chain fraudulently represented that the rebuilt machine would "pick hops efficiently and economically in such a manner as to get the maximum hops from the vines," and the jury determined the issue against the defendant Owen.

It is argued in the defendants' reply brief that no action on the note is maintainable because the extension agreement of October 18, 1951, by which the terms of payment of the note were changed, constituted a new contract supplanting the note. Whether

that be so or not, the question is not before us. This is a court of review and we are authorized in a law action to consider only alleged errors in rulings of the trial court. No ruling on the suggested question was sought by the defendants or made by the court.

The judgment is affirmed.