Argued May 1, reversed and remanded December 23, 1964

# HOLLAND ET UX *v.* LENTZ
## 397 P. 2d 787

*Denton G. Burdick, Jr.,* Portland, argued the cause

for appellant. On the brief were Hutchinson, Schwab & Burdick.

*James C. Niedermeyer,* Portland, argued the cause for respondent. With him on the brief was Paul J. O'Hollaren.

Before McALLISTER, Chief Justice, and ROSSMAN, SLOAN, GOODWIN and LUSK, Justices.

LUSK, J.

This is an action in deceit in which the plaintiffs had a verdict and judgment against the defendant Wesley L. Lentz, who has appealed.

The case arises out of the sale of a dwelling house by Lentz to the plaintiffs. Plaintiffs charge that they were induced to purchase the property by false representations of the defendant concerning the condition of the premises. One such representation alleged was that the house "was a new home and of good quality and that it was constructed in a good and workmanlike manner." The amended complaint sets forth seven particulars in which this representation is claimed to be false, as follows:

"(1) That a substantial portion of the siding of said house has become unfastened from said house.

"(2) That the drains and downspouts and construction of the house are defective, causing drainage to wash away the soil and landscape surrounding the premises.

"(3) That the basement walls are defective, allowing water to flow into the basement and living quarters, causing damage to the contents therein.

"(4) That the construction of the roof and flashing surrounding the chimney of said house is defective, allowing water to flow inside of the house, damaging ceilings and walls.

"(5) That the wallboards covering the walls were insecurely fastened, causing the wallboard nails to become unfastened.

"(6) That the ventilation for the attic portion of the house is inadequate, preventing air flow necessary to the normal air-conditioning of the house.[1]

"(7) That the construction of the residence was defective in that there was no tar paper or similar substance installed under the siding of said residence."

In addition, plaintiffs alleged the following specific misrepresentations:

"(1) That the east side of said house was insulated.

"(2) That the basement slab and the walls of said basement had been underlaid with visqueen.

"(3) That built-in appliances which were damaged would be repaired or replaced.

"(4) That the wallboard defects would be repaired.

"(5) That certain light fixtures which were broken or defectively installed would be replaced and relocated.

"(6) That tile in the entranceway to said house would be repaired.

"(7) That broken windows and air space between the foundation and windows and the frame of the house and window frames would be replaced and corrected.

"(8) That the front door would be refinished.

"(9) That certain landscaping and shrubbery would be installed about the premises.

"(10) That the roof and flashing would be repaired.

"(11) That tile would be installed in such a manner as to prevent the flow of water into the basement of the residence.

---

[1] Stricken by the court.

"(12) That a planter box on the easterly side of said residence would be replaced or repaired."

Defendant's amended answer, besides denying all the allegations of fraud and damage, alleged a waiver of plaintiff's right to rely on such charges based on their acceptance, after full knowledge of the facts, of concessions offered by the defendant from the purchase price of the property.

Evidence of damage under the "benefit-of-the-bargain" rule was introduced by the plaintiffs, the case was submitted to the jury by the court under that theory, and the verdict was in the sum of $2,500.

■■ Defendant moved for a directed verdict on the ground, among others, that none of the representations alleged is actionable. He contends that they are all mere expressions of opinion or promissory statements which do not afford a foundation for an action in deceit. We have concluded that the motion was properly denied, although we agree with counsel for defendant that neither the representation that the house was "of good quality and that it was constructed in a good and workmanlike manner" nor the promissory statements alleged are actionable. We think, however, that the evidence concerning the representation as to insulation of the house was sufficient to carry the case to the jury, though the judgment must be reversed for errors committed upon the trial.

Lentz is a real estate broker. The house in controversy was one of a number of new houses in a real estate development known as "Holly Hills Addition." It was located across the street from Lentz' residence. Since September 1, 1960, Lentz had been engaged in selling these homes for a concern called Contract Builders, Inc., which had built them. On September 20,

1960, Lentz and his wife entered into a contract with Contract Builders, Inc., for the purchase of the house in controversy for $21,000, of which $1,000 was paid in cash and the balance was agreed to be paid in monthly payments of not less than $170.

Mr. and Mrs. Holland, the plaintiffs, called upon the defendant in answer to a newspaper advertisement and were shown the house by him on October 20, 1960. On the same day the parties executed an "earnest money receipt" under which plaintiffs agreed to pay $23,500 for the house. $500, "as earnest money," was paid by a promissory note given at the time of the execution of the instrument. The purchasers agreed to pay $5,500 "upon acceptance of title and delivery of deed" and to pay the balance of $17,500 by the assumption of an existing mortgage which bore interest at the rate of six per cent per annum. The agreement contained a provision that it was subject to the purchasers' completion of the sale of a house owned by them on or before December 1, 1960, and it was stipulated that if the sale was not closed purchasers would occupy the premises "on 1 yr lease option at $24,500.00 at $175 mo." Plaintiffs took possession on November 1, 1960, on November 8 received the money from the sale of their house, and on December 10, paid the defendant $6,000, and at the same time, according to their testimony, executed an agreement assuming the mortgage. Under date of December 1, 1960, the legal owner, Contract Builders, Inc., executed and acknowledged a warranty deed conveying the property to the plaintiffs. The deed was delivered to the plaintiffs.

At the time defendant showed the house to the plaintiffs they called his attention to a number of minor defects which, according to the plaintiffs, he

assured them would be corrected. He also told them that it was a well-built house. Mrs. Holland testified:

"Q Now, when you went through the house with Mr. Lentz and your husband, did Mr. Lentz make any general representations as to the quality of the house?

"A Yes.

"Q Would you state to the Court what Mr. Lentz stated generally as to the quality of the house?

"A Yes. He said this was a fine house, it was very good. And I asked him who the builder was and he told me and I said, 'I've never heard of him.' And he said, 'Well, I can vouch that he's a very good builder.' He said, 'We only let the finest builders build out here.' He said 'You can look around and see the fine homes we have.' And he said, 'This is a good quality,' he said, 'the best.'

"Q Did he say it was a well-built house?

"A Yes, it was. He said it was."

Mr. Holland testified that Lentz stated that the homes in the area were "built by the very best of builders" and that "this was a well-built home, that in the bracket that I paid for it, it should be."

With respect to insulation Mrs. Holland testified:

"Q Now, did Mr. Lentz make any representations about how the house was insulated?

"A Yes.

"Q What did he say?

"A My husband asked him if the house was insulated.

"Q And what did he say?

"A He said, 'In the ceiling and on the East wall.' And my husband said, 'Just the East wall?' And he said, 'Yes.' He said, 'That's all you needed out here in this location.'

"Q Now, did Mr. Lentz make any representations whether there was insulation paper under the siding of the house?

"A Definitely.

"Q And where did he say this? That evening?

"A Yes, because my husband asked him if he had had the building paper on because he said he wasn't interested in a home without building paper at all because we've lived in that East wind for nine years and we know what a home is without building paper insulation. And he said it did contain it. He said, 'All the builders put the insulation paper on, or the building paper.'"

Upon the same subject Mr. Holland testified:

"He stated to me that in the homes built out there, the East wall was the only section where the insulation should be, and I agreed with him, that would be fine. And the outside of the siding that—I asked him if they had the regular building paper under it and he said, 'Sure.'"

Mr. Holland further testified that when the siding pulled away from the house he took off three or four more boards to see if there was paper there and there was no paper.

Roy E. Nelson, a general contractor, testified that his estimated cost of removing the siding, applying paper and putting the siding back on and repainting was $1,279.

The evidence discloses that after heavy rains came in November, 1960, water entered the living rooms and basement of the house. Plaintiffs testified that the defendant promised to repair the roof and install tile and to make other repairs of defects, mostly of minor character, which came to light after the plaintiffs took possession, and that these promises were not kept.

There is uncontradicted evidence that after plaintiffs complained to Lentz about these conditions the subcontractor who put the roof on the house did repair work on the roof, at the defendant's instance, that the defendant sent out a carpenter who made minor repairs and brought the president of Contract Builders, Inc., to talk to plaintiffs about the condition of the house. Most of the defects, however, were not corrected and the roof still leaked at the time of the trial.

In substance, Lentz testified that he made no representations to the plaintiffs other than that it is customary for builders and suppliers of appliances to stand back of their work and installations.

 The defendant's representation that the east side of the house was insulated was material and false. It was material because, according to the plaintiffs' evidence, they told the defendant prior to executing the earnest money receipt that they would not buy a house which was not so insulated. It was not an insignificant matter, for, as above stated, an expert called as a witness by the plaintiffs testified that the cost of removing the siding, applying the insulating paper, putting back the siding, and repainting it would be $1,279. The representation was actionable, even though made with no intent to deceive. "An action of deceit will lie against one who makes a false representation of a material fact upon which another acts to his injury, knowing it to be false, *or when he makes it recklessly as of his own knowledge, without knowing whether it is true or not * * *.*" (Italics added.) *Cawston v. Sturgis,* 29 Or 331, 335-336, 43 P 656. See, also, *Horner v. Wagy,* 173 Or 441, 459, 146 P2d 92; *Sharkey v. Burlingame Co.,* 131 Or 185, 192, 282 P 546; *Burke v. Pardey,* 125 Or 245, 247, 266 P 626; *Leach v. Helm,* 114 Or 405, 412, 235 P 687; *Weeks v. Currier,* 172 Mass

53, 55, 51 NE 416; *Harris v. Delco Products, Inc.,* 305 Mass 362, 365, 25 NE2d 740.

One of the grounds of the motion for a directed verdict was that the plaintiffs waived their right to recover for the alleged fraud by accepting a reduction in the purchase price. The evidence shows that after the plaintiffs paid the $6,000 (i.e., the $500 in payment of their promissory note and the stipulated payment of $5,500) and had full knowledge of the alleged defects in the house Lentz reduced the purchase price from $23,500 to $23,200 and paid the interest on the mortgage and the taxes on the property up to April 1, 1961, although these payments were part of the obligation of the plaintiffs under their contract. Regarding this matter Mrs. Holland testified:

> "A He said that he had paid the interest and the taxes up to the time we assumed the mortgage. And I asked him why and he said, 'Because you're good kids and I like you and you've gone through a lot of trouble,' he said, 'in the basement and lost things and,' he said, 'inconvenience.' And I said, 'Now, just a minute,' I said, 'is this for the roof or the drain tiles or any of these other things? Because,' I said, 'this roof is costly and,' I said, 'we can't afford that.' And he said, 'No, absolutely not.' He said, 'That would still be taken care of.'"

Mr. Holland testified:

> "Q But you did have some kind of a discussion about, because of the troubles you'd had, he'd bring the payments up or he wouldn't charge you, is that right?
> "A He brought up the $23,500 and dropped it down to $23,200.
> "Q I see. In other words, he reduced—he—
> "A For the inconvenience.
> "Q He reduced the price down $300. Now, just to refresh your recollection, wasn't that done some-

time shortly prior to the time the record shows he made that interest payment [o]n April 13, 1961?

"A Not to my knowledge it wasn't; it was made before that when I signed that contract.

"Q But it was—it related to the inconvenience that you'd been put through and troubles that you'd had, didn't it, that he discussed with you?

"A When he dropped the price on the $300, that was for the inconvenience and the leaks and the stuff that was ruined in the basement and he said we would take it up from then on.

"Q Then also, in addition to that, he paid the payments up—I mean, he paid the interest on the mortgage up to April 1st, too, didn't he, besides knocking off the $300 off the price?

"A I took over the mortgage at $17,200, but I don't know what he paid up.

"Q All right, but the mortgage was paid up, the interest on it was paid up until April 1, then you started paying in May. That's right, isn't it?

"A I started making my payments in May, yes."

The defendant was asked whether he had any discussion with plaintiffs about this matter and testified as follows:

"A Yes, I certainly did. And in effect I couldn't find out what they exactly wanted me to do with the house. They were living in the house and had lived in the house for five or six months, were making no payments at all, and I told them that I didn't want them to buy the house if they weren't satisfied with it yet. I couldn't find exactly what they wanted me to do, so we cut the price by $300 under the agreement and I paid interest for five or six months and the taxes for them, and that was in effect a settlement. And I heard no more from them after that.

"Q Well now, did they agree that they'd go ahead if you'd do all those things?

"A They did go ahead and started making payments on the first of May.

"Q You hadn't received any rent or anything else from them other than this $6,000 payment, had you?

"A Not—not a cent."

■ Defendant relies on *Dorr et ux v. Janssen et al*, 233 Or 505, 378 P2d 999; *Conzelmann v. N.W.P. & D. Prod. Co.*, 190 Or 332, 225 P2d 757; *Anderson v. Laws et al*, 176 Or 468, 159 P2d 201. The doctrine of these cases is that where a person who claims that he has been defrauded enters into a new contract in respect of the alleged fraudulent transaction after he knows that he has been deceived he waives his right to maintain an action for the alleged fraud. But this rule cannot be applied to this case as a matter of law because the evidence of the plaintiffs as to the circumstances attending the making of the new agreement renders uncertain the intention of the plaintiffs when they accepted the concession offered by the defendant. The reason for the rule was stated in *Timmerman v. Gurnsey*, 206 Iowa 35, 217 NW 879, where it was said that the defendants, who made the charge of fraud "in getting such important concession, ought not to be permitted to reserve in concealment an intent and purpose directly or indirectly to avoid payment of what they, with full knowledge of the facts, deliberately agreed to pay." This language was quoted with approval in *Anderson v. Laws,* supra, 176 Or at 476. Here the question of waiver was for the jury and was submitted to that body by the court in its charge.

The defendant made proper objection to the admission of evidence that he represented that the house

was of good quality and well built. The objection was overruled and the ruling is assigned as error.

■ Generally, an action in deceit will lie only for false representations of matters of past or existing fact, and hence statements of opinion as, for example, expressions by a vendor commendatory of the thing which he is trying to sell are not actionable even though false: *Sorenson et ux v. Gardner et ux,* 215 Or 255, 258-259, 334 P2d 471 (representation that a house was "well constructed in a workmanlike manner"—dictum); *Smith v. Owen et al,* 208 Or 154, 161, 300 P2d 423 (dictum); *Hansen v. Holmberg,* 176 Or 173, 179, 156 P2d 571; *Horner v. Wagy,* supra, 173 Or at 455 (where earlier Oregon cases are reviewed).

Such expressions are usually regarded as "dealer's talk" or "puffing" and, as stated in 12 RCL 250-251, Fraud and Deceit § 18 (quoted with approval in *Castleman v. Stryker et al,* 107 Or 48, 58, 213 P 436):

> "This rule is based on the universal practice of the seller to recommend the article or thing offered for sale and to employ more or less extravagant language in connection therewith. The law does not hold him to a strict accountability for those vague commendations of his wares which manifestly are open to difference of opinion, and which do not imply untrue assertions concerning matters of direct observation; nor has the buyer any right to rely on such statements."

See, also, 23 Am Jur 792, Fraud and Deceit § 33.

The matter was well put by Judge Learned Hand in *Vulcan Metals Co. v. Simmons Mfg. Co.,* 248 F 853, 856 (2d Cir, 1918):

> "The reason of the rule lies, we think, in this: There are some kinds of talk which no sensible man takes seriously, and if he does he suffers from his

credulity. If we were all scrupulously honest, it would not be so; but, as it is, neither party usually believes what the seller says about his own opinions, and each knows it. Such statements, like the claims of campaign managers before election, are rather designed to allay the suspicion which would attend their absence than to be understood as having any relation to objective truth. It is quite true that they induce a compliant temper in the buyer, but it is by a much more subtle process than through the acceptance of his claims for his wares."

It is recognized, however, that statements of opinion regarding quality, value, or the like, may be considered as misrepresentations of fact, that is, of the speaker's state of mind, if a fiduciary relation exists between the parties as, for example, representations of value made by a real estate broker to his principal: *Melgreen et ux v. McGuire, Inc. et al,* 214 Or 128, 137, 327 P2d 1114; or where the parties are not on an equal footing and do not have equal knowledge or means of knowledge: *Sorenson v. Gardner,* supra, 215 Or at 261; *Patterson v. Western L. & B. Co.,* 155 Or 140, 144, 62 P2d 946; *Downs v. Nat. Share Corp.,* 152 Or 546, 559, 55 P2d 27; *Hyde v. Peirce & Co.,* 147 Or 5, 21, 31 P2d 755; *Ward v. Jenson,* 87 Or 314, 319, 170 P 538; *Boelk v. Nolan,* 56 Or 229, 235, 107 P 689; *Olston v. Oregon W. P. & Ry. Co.,* 52 Or 343, 355, 96 P 1095, 97 P 538, 20 LRA NS 915. And see Restatement, 3 Torts 91, § 539 (1) and Comment on Subsection (1).

Thus in *Patterson v. Western L. & B. Co.,* supra, a judgment for the plaintiff was sustained where a representation by the agent of an insolvent corporation that stock to be issued by the corporation was "a good investment" was made to a person ignorant of the facts. A similar case is *Hyde v. Peirce & Co.,* supra.

But where the representation that stock of a corporation was a "good investment" was made by stockholders in the corporation and there was no fiduciary relation between the parties the statement was held to be "nothing more than an opinion": *Howard v. Merrick,* 145 Or 573, 579, 27 P2d 891.

The only case in our reports so far as we are advised, in which a statement similar to that now under consideration was made the basis of an action in deceit, is *Sorenson v. Gardner,* supra, and, as previously noted, we there observed, obiter, that the representation made by the former owner of a house to a prospective purchaser might not be actionable. There are a number of cases in other jurisdictions, however, in which similar expressions have, under the particular circumstances, been found to be statements of fact and actionable if false, but in all these the representations were made by builders of the houses, and there were other circumstances from which it could be rightfully inferred that the person to whom the representation was made was justified in relying on it: *Crook v. Ford,* 249 Mich 500, 229 NW 587; *Pietrazak v. McDermott,* 341 Mass 107, 167 NE2d 166; *Hafner v. Ritzinger,* 256 Minn 196, 97 NW2d 839; *Doran v. Milland Development Company,* 159 Cal App 2d 322, 323 P2d 792 (applying California Civil Code § 1572 (2)); *Terris v. Cummiskey,* 203 NYS2d 445, 11 AD2d 259. In the opinions in these cases emphasis was laid on the fact that the persons making the representations were builders and therefore had superior knowledge of the workmanship, quality of material, etc., that went into the house involved. But even where the person charged with fraud was a builder a contrary result was reached in cases difficult to distinguish upon their facts: *Yerid v. Mason,* 341 Mass 527, 170 NE2d 718;

*Fogarty v. Van Loan,* 344 Mass 530, 183 NE2d 111; and *Milkton v. French,* 159 Md 126, 150 A 28. In the case last cited, the statement that the purchaser would be "perfectly safe on the concrete, roof and everything else of the construction" was held to be "so vague and general as to be incapable of particular application" and "but the indefinite generalities of exaggeration."

■■ Turning now to the evidence in the case at bar, it should first be observed that the defendant did not build the house he sold to the plaintiffs, that, although he had owned it for a month, he had never occupied it. He was a real estate broker, not a builder, and we are aware of no special competence possessed by one in that calling to discover hidden defects in the construction of a house. He is not shown to have been an expert in that art. While the plaintiffs may be persons of limited education, the evidence discloses that they are not lacking in common understanding or powers of observation and that they were unusually vigilant in their inspection of the house before they bought it. We think that there was no such disparity between the knowledge and means of knowledge of the respective parties as to take the case out of the general rule that expressions of opinion, and especially such vague generalities as we are dealing with here—a "well-built house," "good quality," "fine house"—are not actionable. It is further to be noted that the statement to which Mr. Holland testified: "He told me this was a well-built home, *that in the bracket that I paid for it, it should be*" (italics added), reveals on its face a statement of opinion. It included a reason which indicates that the speaker was not claiming to have any special knowledge of the construction of the house other than that possessed by others. As to the validity

of that reason Mr. Holland could, of course, make his own judgment.

The court erred in overruling the objection to the evidence just considered.

 We think that the issue of fraud based on the alleged promises should not have been submitted to the jury. Such promises are not actionable unless made with the present intention not to perform them: *Sharkey v. Burlingame Co.*, supra, 131 Or at 192-193. And, as we said in *Conzelmann v. N. W. P. & D. Prod. Co.*, supra, 190 Or at 352:

> "A fraudulent intent not to perform a promise may not be inferred as existing at the time the promise is made from the mere fact of nonperformance. Other circumstances of a substantial character must be shown in addition to nonperformance before such inference of wrongful intent may be drawn."

Our recent decision in *Reimann v. Brent*, 238 Or 415, 395 P2d 284, holding that the plaintiff could not recover in deceit for failure of the vendor of a house to keep promises made by his agent to repair defects in the house is controlling on this question. There is this difference between the two cases. In *Reimann v. Brent* the vendor admitted making the promise. Here the defendant denied that he made any of the promises alleged. Some courts have held that such a denial is evidence that the promise was fraudulent, *Texas Employers' Ins. Ass'n. v. Knouff*, 297 SW 799 (reversed on other grounds, 7 SW2d 68); *Tatum v. Orange & N. W. Ry. Co.* (Tex) 245 SW 231; *Woods-Faulkner & Co. v. Michelson*, 63 F2d 569, 573 (8th Cir, 1933).

The Minnesota Court took a contrary view in *Mc-*

*Creight v. Davey Tree Expert Co.,* 191 Minn 489, 494-495, 254 NW 623, where the court said:

"The typical defendant in such cases simply denies making the promise. If in any case one is so lacking in both honesty and intelligence as to both deny the promise and also aver intention to perform, it will be time enough to apply the proposition that a defendant cannot 'consistently claim both that it did not make the representation,' but yet intended 'to carry out or make good such a representation.' Woods-Faulkner & Co. v. Michelson (C. C. A.) 63 F. (2d) 569, 573. Such an impossible straddle would be plain asininity and so not permissible. But this defendant, and all intelligent defendants in similar cases, honest or not, simply deny the promise. Such denial implies not at all that, if the promise were made, there was no intention to perform. And it certainly does not bar the defendant, when the evidence is all in, from saying to the plaintiff: 'Even though the trier of fact may believe I made the promise, there is no proof that I did so fraudulently because of an intention not to perform.' Bad indeed would be the case of the honest man who has made no such promise, if when falsely charged with it, he may not deny it without having his truth considered as some evidence either that there was such undertaking or that it was deceitfully made."

We agree with the reasoning of the Minnesota Court. The other rule would tend to permit recovery for fraud in cases where nothing more than a broken promise is proved.

■ The alleged representation that the basement slab and the walls of the basement had been underlaid with Visqueen should not have been submitted to the jury, as there is no evidence that the representation was false or that it was material. The only evidence as to what Visqueen is and what purpose it serves in

a house was furnished by Mr. Holland, who testified: "Well, I don't know anything about building, but from what I understand, it's the stuff that they put under the slab before pourin'." This is not sufficient to support a finding that the representation, even though false, induced the plaintiffs to purchase the house.

■ The court submitted to the jury a claim for punitive damages which the jury disallowed. There is no evidence in the record to justify recovery of punitive damages, and on another trial the issue should be withdrawn.

■ As above stated the court in its charge gave to the jury the "benefit-of-the-bargain" rule, that is, that the measure of damages was the difference between the actual value of the property and its value if it had been as represented: *Selman v. Shirley,* 161 Or 582, 608, 85 P2d 384, 91 P2d 312, 124 ALR 1. It is doubtful whether that rule was applicable under the evidence. On another trial, unless it should appear by substantial evidence that the represented value of the property was greater than the purchase price, the court should instruct the jury that the measure of damages is the difference between the actual value of the property received and the purchase price: *Horner v. Wagy,* supra, 173 Or at 446.

The judgment is reversed and the cause remanded for further proceedings in conformity with this opinion.