Argued and submitted November 25, 1998, reversed and remanded in part; otherwise affirmed February 9, petition for review denied June 20, 2000
(330 Or 363)

Edwin J. NIELSEN
and Aletha C. Nielsen,
*Appellants,*

*v.*

Del STEPHENS
and Bruce Moore,
*Defendants,*
*and*
JS INVESTMENTS, INC.,
an Oregon corporation,
and F.J. Boresek,
trustee of the F.J. Boresek Trust,
*Respondents.*
(16-95-08514; CA A100578)

997 P2d 257

Paul D. Clayton argued the cause for appellants. With him on the briefs were Larry J. Anderson and Anderson & Clayton.

Terence J. Hammons argued the cause for respondents. With him on the brief was Hammons, Mills & Spickerman.

Before Edmonds, Presiding Judge, and Armstrong and Kistler,* Judges.

ARMSTRONG, J.

---

* Kistler, J., *vice* Warren, P. J., retired.

## ARMSTRONG, J.

Plaintiffs appeal from a summary judgment dismissing their claims for fraud and breach of contract against defendants J.S. Investments, Inc. (J.S.), and F.J. Boresek, trustee of the F.J. Boresek Trust (Boresek). Plaintiffs have settled their claims against defendants Stephens and Moore, who played significant roles in the events at issue. We reverse and remand.

We state the facts most favorably to plaintiffs, the nonmoving parties. *See* ORCP 47; *Jones v. General Motors Corp.*, 325 Or 404, 939 P2d 608 (1997). Plaintiffs own a home and two acres of land near Florence. At the relevant times they also owned a parcel south of Florence that was zoned for commercial use. A Florence savings and loan association had a mortgage on the home to secure a loan. For various reasons, apparently including administrative disruptions within the savings and loan that increased when the Resolution Trust Corporation took control of its assets, plaintiffs fell into default on the mortgage. Sun Life Insurance Company, to which the RTC had assigned the loan, filed a foreclosure proceeding in 1993 and received a judgment of foreclosure on December 17, 1993. Sun Life purchased the property at the sheriff's sale on March 9, 1994, for the amount of its judgment. Plaintiffs then had 180 days to redeem their property from the foreclosure. ORS 88.080; ORS 23.560.[1]

In May 1994 Stephens got in touch with plaintiffs and offered to find a purchaser for their redemption rights. Plaintiffs responded by asking whether he could help them get a loan that would allow them to retain their property. Stephens then told plaintiffs that he and Moore, a Eugene lawyer, had access to money that plaintiffs could borrow for that purpose. He told plaintiffs that Moore and he would represent them in obtaining the loan and clearing title to their property. Plaintiffs dealt primarily with Stephens in arranging financing, but they also met with Moore two or three

---

[1] Sun Life initiated an FED proceeding and received a judgment authorizing the sheriff to evict plaintiffs, but the sheriff did not enforce the eviction before the exercise of plaintiffs' right to redeem. Plaintiffs continued to live in their home throughout the time involved in this case.

times in Moore's office, primarily to deal with title issues. Eventually plaintiffs were told that they had obtained a loan and that the closing would be on June 27, 1994. When they reviewed the papers at the title company that morning they discovered that the transaction was not a loan but a sale of all of their interest in both their home and the commercial property south of Florence, including their redemption rights,[2] to J.S. and Boresek with an option to repurchase the property on or before October 27, 1994, for about $18,000 more than J.S. and Boresek paid for it. If plaintiffs did not exercise the option, then they would receive $10,000 after October 27.

The assignment of plaintiffs' redemption rights contained the following notice and disclaimer:

> "IT IS EXPRESSLY UNDERSTOOD BY [NIELSENS] THAT IF THEY DO NOT EXERCISE THEIR OPTION TO PURCHASE NO LATER THAN OCTOBER 27, 1994, THAT THEY SHALL HAVE NO FURTHER INTEREST OF ANY KIND IN THE SUBJECT REAL PROPERTY, AND ASSIGNEES WILL BE FREE TO SELL, TRANSFER OR CONVEY THE SUBJECT REAL PROPERTY TO THIRD PARTIES WITH NO OBLIGATION OF ANY KIND TO THE [NIELSENS]."

The assignment permitted plaintiffs to retain possession of the property until the end of the option period and required them to surrender possession at that time, after which they would have no possessory interest in it.

Because the transaction was not what they had expected, plaintiffs called Moore before signing the papers. In that call, Moore told them for the first time that he did not represent them but, rather, represented J.S. and Boresek. Moore also told them that, because of the pending eviction proceedings, they would lose their property irrevocably if they did not sign the papers. After that conversation, plaintiffs completed the transaction.

Plaintiffs did not exercise the option within the required period, and J.S. and Boresek did not make the

---

[2] By that time, both plaintiffs' home and the commercial property were the subject of tax foreclosure proceedings as well as the Sun Life foreclosure on the home.

$10,000 payment that the agreement required in that circumstance. After the option expired, Stephens told plaintiffs that he could obtain an extension of the option for $15,000. Plaintiffs ultimately paid Stephens $10,000 for an extension. The other defendants deny any knowledge of that payment and deny that Stephens had the authority to extend the option. In April 1995, J.S. and Boresek, represented by Moore, filed an FED proceeding seeking to evict plaintiffs from their home. At the same time, plaintiffs negotiated with J.S. and Boresek to repurchase the property. They ultimately reached an agreement (the repurchase agreement) under which plaintiffs repurchased at a price that was about $15,000 greater than the amount provided in the original option, or about $33,000 greater than the original purchase price. The repurchase, like the original purchase, included the commercial property south of Florence. However, in order to finance the repurchase, plaintiffs sold that property at less than half of its true value in what they described as a fire sale. The repurchase closed on July 13, 1995. If Stephens had actually obtained an extension of the option to repurchase the property in return for plaintiffs' payment of $10,000, then the extension would have expired before that time. Plaintiffs filed this action two months later.

In their first claim, for fraud, plaintiffs alleged that all defendants represented to them that the transaction of June 27, 1994, was to be a loan in the traditional sense, that that representation was false, that all defendants knew it to be false and intended plaintiffs to rely on it, that plaintiffs were ignorant of the falsity and did rely on it, and that, as a result of the misrepresentations, by June 27 they had no alternative but to go through with the transaction as it was actually structured. In their motion for summary judgment on that claim, J.S. and Boresek argued both that there was no evidence that plaintiffs relied on the alleged misrepresentations, because they knew what the documents were before they signed them, and also that plaintiffs ratified any fraud and waived their claims by entering into the subsequent repurchase agreement.

We first consider whether there is evidence that plaintiffs relied on the misrepresentations. J.S. and Boresek

rely on *Ward v. Jenson*, 87 Or 314, 170 P 538 (1918), in support of their argument that plaintiffs did not rely. In *Ward* the plaintiff sought damages for fraud that the defendant allegedly committed with respect to an exchange of properties. She alleged that, among other misrepresentations, the defendant had told her that he owned a ten-acre parcel that was part of the exchange and that he had a mortgage for $8,000 on it, which he stated was evidence of the value of that portion of the property. In fact, the defendant did not own that parcel but had only a contract to purchase it, and there was no mortgage. The defendant asserted that the plaintiff knew the truth about those matters before she entered into the exchange. The Supreme Court reversed a judgment for the plaintiff on other grounds but commented in *dictum* that, if the plaintiff did in fact know that the defendant only had a contract to purchase the ten acres and that there was no mortgage on it and, notwithstanding that knowledge, exchanged properties, then she could not predicate fraud on any statements that the defendant had made on those matters. 87 Or at 321. J.S. and Boresek argue that plaintiffs in this case knew exactly what the transaction was before entering into it and thus, under the rule of *Ward*, could not have relied on representations that the transaction would be something else.

■ The dispositive distinction between this case and *Ward* is that the fraud that plaintiffs allege in this case is promissory fraud. *See, e.g., The Communications Group, Inc. v. GTE Mobilnet,* 127 Or App 121, 126, 871 P2d 502, *rev den* 319 Or 406 (1994). Their claim is that defendants represented that they would provide a loan to refinance their property but instead presented them with a sale of the property to J.S. and Boresek. Because the alleged fraud was in the promise of what the transaction would be, plaintiffs relied on it before June 27, when the transaction closed under the fraudulent conditions. Plaintiffs relied by making Stephens and Moore their primary source for borrowing money to redeem their property. Plaintiff Aletha Nielsen testified in her deposition that, before plaintiffs began dealing with Stephens, they had been looking at other potential sources of money and that they were getting close to an agreement. A jury could find on this record that the alleged fraudulent promises

were the reason that plaintiffs stopped working with those other sources. As a result of their reliance on defendants' promises, when plaintiffs had to decide on June 27 whether to go through with the sale, they could legitimately have believed that they had no realistic alternative to agreeing to the terms with which they were presented.

In *Ward*, the alleged fraudulent representations concerned the value and ownership of the property that the plaintiff purchased rather than the nature of the proposed transaction. The plaintiff could have decided at any time before closing not to go through with the deal with no negative effects other than the loss of a possible investment. Any reliance, thus, must have occurred when she completed the exchange of properties. If she knew the truth at that time, then she could not have relied on the misrepresentations in deciding to make the investment. In contrast, in this case the nature of the misrepresentations required plaintiffs to rely well before the closing date, so the fact that plaintiffs learned the truth before that time does not necessarily show that they did not rely on the fraudulent promises.

■     J.S. and Boresek's second argument is based on the rule that the Supreme Court summarized, again in *dictum*, in *Conzelmann v. N. W. P. & D. Prod. Co.*, 190 Or 332, 354, 225 P2d 757 (1950):

> "[W]hen one who has been induced by fraud to enter into a contract, subsequently, with knowledge of the fraud, enters into another agreement respecting the same transaction with the one guilty of the fraud, he, the injured party, thereby waives and relinquishes all right to damage on account of such fraud. If he receives some substantial concession from the one guilty of such fraud, he waives his right to insist further upon holding the wrongdoer responsible in damages for the fraud."

According to J.S. and Boresek, when plaintiffs agreed to the repurchase agreement with full knowledge of any fraud, they entered into a new contract concerning the same transaction and thereby both ratified the June 27 transaction and waived their right to damages for the fraud that preceded it. The issue is not, however, as simple as J.S. and Boresek would make it. The cases before and after *Conzelmann* show there

are issues concerning whether the repurchase agreement was part of the same transaction as the fraud and whether plaintiffs received a substantial concession based on their claim of fraud.[3]

In *Anderson v. Laws et al.*, 176 Or 468, 159 P2d 201 (1945), the first significant Oregon case on this point, the plaintiff alleged that the defendants made representations that induced the plaintiff to purchase stock in a new corporation. After the organization of the corporation, the plaintiff and the defendants entered into an agreement to satisfy the plaintiff's claims concerning the purchase. Under that agreement, the defendants and plaintiff would have successive opportunities to sell the plaintiff's stock. If they failed, then the corporation would be dissolved and the plaintiff would have the first claim on the assets at liquidation until he had received the amount that he had paid for the stock. Based on those facts, the Supreme Court held that the plaintiff had waived his right to sue for fraud. In doing so, it commented that, although the question of whether one intends to waive a known right is usually one of fact, "in a case like this where the facts are not in dispute the law conclusively presumes the intent from the person's conduct." 176 Or at 478.

In *Conzelmann*, the plaintiffs sent live turkeys to the defendant for processing and storage until the market improved. Instead of storing the turkeys, however, the defendant sold them immediately. When the plaintiffs complained, the defendant agreed to replace the turkeys bird for bird, grade for grade. It ultimately purchased the replacement birds from the plaintiffs, waiving deferred payments for processing and storage and paying for all shortages in weight. The Supreme Court held that, even assuming that there was evidence of promissory fraud, the subsequent agreement to sell the birds to the defendant, in which the plaintiffs

---

[3] The Supreme Court's statement in *Conzelmann*, indeed, is not entirely clear on some crucial points, such as whether receiving a substantial concession is essential to waiving a claim for fraud. The first sentence in the quotation may suggest one answer, but the second sentence clearly suggests another. As we will see, subsequent cases show that the second sentence states the applicable rule.

received substantial concessions, waived the fraud. It emphasized that the settlement of all differences between the parties was complete when they made the new contract; the conclusive presumption of waiver arose at that point. 190 Or at 356.

In *Dorr et ux v. Janssen et al*, 233 Or 505, 378 P2d 999 (1963), the plaintiff, who was one of the parties to an exchange of properties, was unable to make all of the payments required under the exchange. He then reconveyed all of the property that he had received to the defendant, obtaining an additional 90 days in which he could sell those properties on his own account and the cancellation of notes that he had executed in order to make the payments that he had made. The Supreme Court held that, by participating in the new agreement, which was supported by consideration and materially changed the rights and duties of the parties, the plaintiff relinquished his right to damages for the alleged misrepresentations.

In *Holland v. Lentz*, 239 Or 332, 397 P2d 787 (1964), the plaintiffs alleged that the defendant made various misrepresentations concerning the sale of a house. After problems first appeared, the defendant reduced the purchase price and made some mortgage payments that were otherwise the plaintiffs' responsibility. The defendant argued that, under *Anderson* and similar cases, the plaintiffs' acceptance of those actions constituted a waiver of the alleged fraud. The plaintiffs testified that the defendant's concessions were intended to cover only some of the problems that they had experienced, not to resolve the entire dispute. Based on that testimony, the Supreme Court held that there was no waiver as a matter of law, because the plaintiffs' testimony made their intention when they accepted the concessions uncertain.

In *Atherton v. Collins*, 240 Or 265, 401 P2d 15 (1965), the Supreme Court again emphasized that a waiver requires that the parties enter into the subsequent agreement "to make adjustments of their former rights and obligations *because of one party's claim of fraud*." Without such evidence, there is no waiver. 240 Or at 269. In *Lackey v. Ellingsen*, 248 Or 11, 432 P2d 307 (1967), the court stressed

that what matters is the intent of the parties in entering into the new agreement. In that case, the trial court "specifically found that there was no intention to form a new contract and, in effect, to erase the consequences of the misrepresentation." Thus, there was no waiver. 248 Or at 15.

■ Those cases show that, in order for a new agreement to operate as a waiver of a claim for damages for fraud, it is essential that the parties intend that it have that effect. In *Anderson* and *Conzelmann* the court could make that decision as a matter of law because the facts, including the parties' intent in entering into the new agreement, were essentially undisputed. As later cases show, however, when there is any uncertainty about that intent, the question is one for the jury. The cases also emphasize that the new agreement must be part of the same transaction, although what exactly is a new agreement is not as clear as the requirement that there be an actual intent to waive the fraud.[4]

■ In this case, there are factual issues on both points. J.S. and Boresek rely on the repurchase agreement as establishing both ratification and waiver. However, a jury could find that the parties agreed to the repurchase agreement and that the repurchase occurred after the first transaction, that of June 27, was completed. The option to repurchase in the June 27 agreement expired at midnight October 27, 1994, and even the purported extension that Stephens promised would have expired before the repurchase closed. The original agreement permitted plaintiffs to stay on the property as long as the option lasted. By filing an FED proceeding in April 1995 in an attempt to evict plaintiffs, J.S. and Boresek showed that, in their minds, the option period had ended before that date and they had an absolute right to the property. Plaintiffs believed that the repurchase agreement was a new agreement that they negotiated with J.S. and Boresek, not an exercise of the option in the June 27 agreement. The terms of the repurchase agreement were different from, and

---

[1] Plaintiffs suggest that the distinction is between an agreement that is executed and one that is still executory. As J.S. and Boresek point out, the Supreme Court in *Lackey* did not accept that distinction. 248 Or at 15. That does not, however, affect the requirement that, in order for the new agreement to operate as a waiver, it must be part of the original transaction.

more onerous to plaintiffs than, the original option. The disclaimer in the June 27 agreement emphasized that plaintiffs would lose all of their interest in the property if they did not exercise the option by the required date. Those facts would support a finding that, although the repurchase agreement involved the same property as the June 27 agreement, it was a new transaction rather than a modification of the original purchase.

■    There is also evidence that the parties did not believe that the repurchase agreement related to plaintiffs' fraud claims and, thus, that it was not a waiver of those claims. A jury could find that plaintiffs did not assert any fraud claims before the repurchase or otherwise accuse J.S. or Boresek of improper conduct, so those defendants would not have known that there was anything to compromise. In addition, the apparent absence of concessions to plaintiffs[5] at the least suggests that they did not receive anything in return for a waiver, which suggests that they did not intend to waive any existing rights.[6] The trial court erred in granting summary judgment on the fraud claim against J.S. and Boresek.

■    Plaintiffs also assign error to the trial court's grant of summary judgment on their fifth claim, in which they sought the $10,000 that the original agreement provided if they did not exercise the option to repurchase that that agreement contained. If the original agreement was separate from the repurchase agreement, then J.S. and Boresek breached it by not paying the $10,000 when the option expired. If the repurchase was a modification of the original agreement, then plaintiffs are not entitled to the $10,000. For the reasons that we have previously discussed, whether the two agreements were part of the same transaction or of separate transactions

---

[5] J.S. and Boresek might argue that the very agreement to sell the property back to plaintiffs at less than its market value was a concession. That argument, however, at the most raises a question for the jury and does not support summary judgment.

[6] Although plaintiffs may have waived the right to rescind the transaction by entering into the sale of their redemption rights, they did not by that fact alone waive their claim for damages. A party that has been fraudulently induced to enter into a contract may, upon the discovery of fraud, affirm the contract and seek damages for the fraud. *Scott v. Walton*, 32 Or 460, 464, 52 P 180 (1898).

is an issue of fact. Thus, the trial court also erred in granting summary judgment on that claim.

Judgment on plaintiffs' first and fifth claims against defendants J.S. Investments, Inc., and F.J. Boresek, trustee of the F.J. Boresek trust, reversed and remanded; otherwise affirmed.