### EARN LINE S. S. CO. v. MANATI SUGAR CO. et al.

(Circuit Court of Appeals, Second Circuit. December 1, 1920.)

No. 24.

1. Shipping ⬸170—Risk of delay is on vessel, in absence of agreement.

Since the duty of carrying and delivering the cargo is that of the ship, the risk of delay lies upon her, in the absence of contract to the contrary.

2. Shipping ⬸181—"Demurrage" for delay at port of call held not imposed on charterer, where unloading is within lay days.

"Demurrage," which is the sum agreed to be paid to the ship for delay caused without her fault, and which ordinarily does not begin to run until the lay days have been used up, is not imposed on the charterer for delay at port of call, where thereafter the vessel was discharged before the expiration of the lay days, though the charter provided that delay at port of call should be counted as demurrage days, since that provision

⬸For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

will be construed only to charge such demurrage in case thereafter the vessel is not unloaded within the lay days.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Demurrage.]

3. **Shipping** ⬳49 (6) —**Charterer not entitled to dispatch money in advance of charter agreement.**

Though the regulation of the joint committee of the United States Shipping Board and Food Administration authorized dispatch money, the charterer waived his right to such dispatch money by accepting a charter party, prepared by the committee, which made no provision therefor.

4. **Shipping** ⬳118—**Damages for closing refinery not chargeable against vessel carrying sugar.**

The assignee of a charterer cannot recover from the vessel, for delay in delivery of the cargo of sugar, damages sustained by shutting down its refinery for want of raw sugar, since the parties could not have contracted with reference to such possibility.

Appeal from the District Court of the United States for the Southern District of New York.

Libel by the Earn Line Steamship Company against the Manati Sugar Company, which brought in the Federal Sugar Refining Company. From a decree disallowing the claim of libelant, and allowing the claims of respondents only in part, all parties appeal. Modified and affirmed.

Haight, Sandford, Smith & Griffin, of New York City (C. B. Smith, of New York City, of counsel), for libelant.

Sullivan & Cromwell, of New York City, for respondent Manati Sugar Co.

Ernest A. Bigelow, of New York City, for respondent Federal Sugar Refining Co.

Before WARD, ROGERS, and HOUGH, Circuit Judges.

WARD, Circuit Judge. January 4, 1918, at the city of New York, the Earn Line Steamship Company chartered its steamer Harald to the Manati Sugar Company to carry a cargo of sugar from Cuba and to deliver it at Yonkers, N. Y. The material provisions of the charter party are as follows:

"Fourth. * * * Lay days for discharging to begin when the vessel arrives and reports ready to deliver cargo, whether berthed or not. Any time spent at the port of call or discharging port (New York deemed port of call if discharge to be at Yonkers) until receipt of orders to count as demurrage days; also any time spent waiting for the securing of necessary import licenses or documents or any kind whatsoever required by any governmental authority, or delay for any cause or reason for which the steamer, her owners and/or representatives, are not responsible, to count as demurrage days. Vessel to be discharged at the rate of not less than seven thousand five hundred (7,500) bags of 325 pounds each per working day. Lay days are not reversible. For each and every day's detention, the party of the second part shall pay to the party of the first part, or agent, demurrage, day by day, at the rate of forty-eight cents (48c.) United States currrency per ton of the vessel's gross registered tonnage.

"Fifth. The bills of lading on Earn Line Steamship Company form to be signed without prejudice to this charter and subject to this contract as to freight, dead freight, and all other conditions, including loading, discharging, and demurrage."

The charter party was on a form prepared and furnished by the Joint Committee on West Indies Transportation of the United States Shipping Board and United States Food Administration. No other form could have been used by the parties. Subsequently the Manati Company sold the cargo to the Federal Sugar Refining Company which received it as consignee and must have been holder of the bills of lading, which are not in evidence. The fifth article of the charter party, supra, required that they should incorporate all provisions of the charter as to discharge and demurrage.

The steamer was cleared in the custom house at New York, February 6th at 3:30 p. m., but did not start for Yonkers until 1 p. m. of the 7th, where she began discharging at 4:20 p. m. and finished February 9th at 1:30 p. m. It is conceded that the consignee had 4.3074 working days for discharging the cargo and used but 1.625, thus saving 2.6824.

The Steamship Company filed this libel against the Manati Company for a balance of freight, and afterwards amended it by adding a claim for demurrage incurred at New York between 3:30 p. m. February 6th and 1 p. m. February 7th.

The Manati Company brought in the Federal Sugar Refining Company under the fifty-ninth rule (29 Sup. Ct. xlvi), which set off its claim for dispatch money and for damages resulting from its refinery being closed down for want of raw sugar from the afternoon of February 6th until 4:30 p. m. of the 7th, when the steamer began to discharge.

The District Judge disposed of these claims as follows:

First. He disallowed the claim of the Steamship Company for demurrage on the ground that it was responsible for the delay in starting for Yonkers.

Second. He allowed the claim of the Federal Sugar Refining Company for dispatch money in discharging.

Third. He disallowed the Federal Sugar Company's claim for damages resulting from the shutting down of its refinery.

We agree with the learned judge's finding as to the first claim, but on a different ground, viz. that as demurrage begins to run only after expiration of lay days, and the steamer was discharged within the lay days, no demurrage is recoverable, whether the delay at New York was justified or not.

[1] As the duty of carrying and delivering the cargo is that of the ship the risk of delay would lie upon her in the absence of contract to the contrary. Demurrage is the sum agreed to be paid to the ship for delay caused without her fault. It has become usual by contract to impose the risk of delay in loading and discharging upon the charterer or cargo owner, and there is nothing to prevent the parties from doing the same thing in respect to delay incurred between the loading and discharging ports. Unquestionably such delay does prolong the voyage, even if the cargo be discharged within the stipulated lay days.

[2] Article 4 of this charter is susceptible of construction either way, and the question is which construction should we adopt. In it the parties agreed that delay at New York, which is the port of call, for any cause for which the shipowners are not liable shall be "counted

as demurrage days," and that demurrage shall be payable day by day. We think they could not have intended that demurrage should be collectible at the port of call, but only that delay there not imputable to the shipowners should be "counted" and collected as demurrage days at the port of discharge. Demurrage days as usually understood do not begin to run until the lay days have been used up. If the discharge of cargo uses all the lay days, or more than the lay days, then the days of delay at the port of call are to be counted as demurrage days. This is what demurrage usually means, viz. the amount agreed to be paid for the prolongation of the voyage by delay in loading or discharging cargo. If the parties had intended to put delay at the port of call upon the charterer absolutely, we think they ought to have expressed their meaning more clearly.

[3] We disagree with the learned judge as to the second claim. December 19, 1917, the Joint Committee on West Indies Transportation of the United States Shipping Board and United States Food Administration published and promulgated its first regulations for the importation of raw sugar from Cuba, the material provisions of this circular being:

*Charter Party.* "That uniform charter party and bill of lading shall be employed in Cuban and Santo Dominican trades.

*Demurrage and Dispatch Money.* " * * * That dispatch money shall be paid, if earned, at the rate of sixteen cents (16c.) per gross registered tonnage of vessel per day, to the party or parties responsible for the dispatch."

The committee furnished the blank for the charter party which was used in this case, and it must have been a form prepared at the time they issued these first regulations or before January 4, 1918, when it was used. There being no evidence whatever of any mistake, we are bound to assume that the committee deliberately omitted from the form they supplied the provision as to dispatch money. The charter party constitutes the contract between the parties, and, even if the libelant were entitled under the regulations to dispatch money, it must be taken to have waived this provision by signing the form of charter party which contained no such provision. We think it entitled to no dispatch money.

[4] The third claim, for consequential damages resulting from closing down the refinery, was rightly dismissed. When the charter party was executed January 4, 1918, the parties could not have contracted with reference to the possibility that upon arrival at New York some one of the many refineries in the United States which might purchase the sugar would have to shut down if delivery were delayed. They could not tell to what refinery the sugar would ultimately go, or what the supply of sugar such refinery would have on hand when the vessel arrived. Howard v. Stillwell & Bierce Manufacturing Co., 139 U. S. 199, 11 Sup. Ct. 500, 35 L. Ed. 147.

The court below is directed to strike out the allowance for dispatch money, and, as so modified, the decree is affirmed, without costs of this court to either party.