CIA. ESTRELLA BLANCA, LTDA., as owner of the S. S. Nictric, Libelant,

v.

Subfreights and demurrage monies of the S.S. NICTRIC, and Amtro Corporation, S.A., of the Republic of Panama, Respondents,

and

Amtro Corporation, S.A., a Panamanian Corp., Claimant.

AMTRO CORPORATION, S.A., a Panamanian Corp., Cross-Libelant,

v.

SCHNITZER STEEL PRODUCTS CO., a corporation, Garnishee under the Libel and Cross-Respondent.

Civ. No. 61–538.

United States District Court
D. Oregon.
May 25, 1965.

Lofton L. Tatum, Wood, Wood, Tatum, Mosser & Brooke, Portland, Or., for libelant.

Alex L. Parks, Dusenberry, Martin, Beatty & Parks, Portland, Or., for respondent, Amtro Corporation, the claimant and cross-libelant.

Gunther F. Krause, Krause, Lindsay & Nahstoll, Portland, Or., for garnishee and cross-respondent.

KILKENNY, District Judge.

For decision is a three party controversy between the owner of a vessel, a time charterer and a voyage charterer. A libel was commenced by the owner of the vessel SS NICTRIC against the time charterer, Amtro Corporation, S.A., for sums alleged due under the charter and for a breach thereof, together with a libel *in rem* against the subfreights and demurrage monies of the SS NICTRIC in the possession of Schnitzer Steel Products Co., the voyage charterer. Amtro filed a cross libel

against Schnitzer for demurrage, freight and other charges claimed under the voyage charter between Schnitzer and Amtro, under which Amtro transported for Schnitzer a cargo of scrap metal from the United States and Canada to Japan aboard said vessel. Additionally, Amtro seeks damages from Schnitzer for a breach of the charter and for misrepresentation. The time charter of the NICTRIC from owners to Amtro was dated June 23, 1961, and was for a period of approximately nine months, thirty days, more or less. The charter hire was on the basis of $23,090.16 per month, payable one month in advance. Amtro was required to deposit one month's hire with an escrow agent and took delivery of the NICTRIC on August 6, 1961, the hire commencing the following day. Under a time charter, the owner's crew continues to navigate and manage the vessel, but the cargo carrying capacity is rented by the time charterer for a fixed period of time for the carriage of goods, on as many voyages as may fit into the charter period, the ship being subject to the time charterer's direction as to ports touched, cargo loaded and other business matters.

Amtro entered into a voyage charter with Schnitzer on July 14, 1961, under the terms of which charter the carrying capacity of the vessel was let to Schnitzer for a single voyage from Canada and Oregon to Japan. The designated cargo was scrap metal. Under this charter the freight charge was a lump sum of $63,-000.00, plus $2,500.00 for an extra loading port, 90% of the freight to be prepaid and the balance payable on completion of discharge. The cargo was to be loaded, stowed and discharged within a total of 23 weather working days of 24 hours each, Sundays and holidays excepted unless used, in which case the actual time used was to be counted. The time period mentioned is customarily referred to as "lay time." The lay time expired on October 9, 1961. Congested harbor conditions in Japan caused a delay of approximately three months, the discharge being completed on December 31, 1961. The charter provided for demurrage at the rate of $700.00 per day after the expiration of the lay time. Remaining unpaid on the total freight bill is the sum of $4,550.00.

The monthly charter hire for August, September and October, 1961, was paid by Amtro. No payment was made in November nor thereafter. Due to the failure to make the payments as specified, Owners, on December 31, 1961, withdrew the NICTRIC from the time charter. The vessel was then drydocked for repairs until January 16, 1962, after which it voyaged to a port in Australia and was there re-chartered.

## OWNERS' CLAIMS AGAINST AMTRO

### Charter Hire

■ Owners and Amtro agree that the sum of $21,530.89 is the amount due under the charter to the date of its withdrawal on December 31, 1961. However, Amtro claims an offset of $1,874.17, due to the fact that Schnitzer's lay time was extended when a deficiency in the vessel's loading gear interrupted a loading operation at Westminster, B. C. Amtro's theory is that the extension in Schnitzer's lay time caused a reduction of $1,-874.17 in the amount of demurrage it can claim and that this constituted a breach of Clause 1 of the time charter which provided, among other things, "That the Owners shall * * * keep the vessel in a thoroughly efficient state in hull, machinery and equipment for and during the service." Owners disclaim responsibility for reduced demurrage on the ground that Clause 15 of the charter provided Amtro's exclusive remedy and that a credit of $846.64 has been given to Amtro under said Clause.[1] A similar clause was before District Judge Learned Hand when he decided, in the lower court, a

---

1. "15. That in the event of the loss of time from * * * breakdown or damages to hull, machinery or equipment * * *, or by any other cause preventing the full working of the vessel, the payment of hire shall cease for the time thereby lost; * * *."

case which was later appealed and is cited as The Bjornefjord, 271 F. 682 (2d Cir. 1921). There, Judge Hand concluded that the charter remedy was exclusive. Judge Hand's interpretation of this clause is, in my opinion, sound and should be followed. Owners are entitled to judgment against Amtro for the balance of the charter hire, to-wit: $21,530.89.

### Crew Overtime

■ Amtro disputes Owners' claim of $1,658.41 for crew overtime, conceding, however, that the sum of $478.47 is owing on such claim. Involved in the dispute is a construction of Clause 23 of the charter.[2]

Of vital significance is the fact that the underlined language was substituted by the parties in lieu of that which read: "officers, engineers, winchmen, deck hands and donkeymen for overtime work done in accordance with the working hours and rates stated in the ships articles." The record discloses that the substitution was made in order to eliminate the need for mathematical calculations and record keeping. If, as argued by Amtro, the language be interpreted to mean that the overtime should apply only during periods of loading and discharge, there would have been no need for the elimination of the quoted language, nor for the substitution of the underlined language. True enough, the substituted language is subject to a charge of ambiguity. Nevertheless, when read in the light of the Captain's testimony and of the deleted language, the intention of the parties assumes a cloak of understanding and dictates a finding that the parties intended a flat $350.00 per month, or pro-rata for a partial month, regardless of the actual amount of overtime consumed. Otherwise, the substituted language is completely without meaning. Owners' claim is allowed.

### Crew Bonus

■ Clause 29 of the time charter requires Amtro to pay a crew bonus of $1,000.00 per month while certain types of cargo is aboard.[3]

The Commandant of the Coast Guard is authorized and directed to define, describe, name and classify all explosive or other dangerous articles or substances and to establish such regulations as may be necessary to make effective the provisions of 46 U.S.C. § 170, in connection with the regulation of the carriage on vessels of explosives or other dangerous articles.[4] At the time of signing the charter, the Commandant had, by regulation, defined dangerous articles.[5] That the Commandant intended to distinguish between ordinary "dangerous" articles, such as explosives, and "hazardous" articles, is clearly indicated by 46 C.F.R. Sec. 146.27–100, Table K, which classifies hazardous articles, one of which is "metal

2. "23. Vessel to work night and day, if required by Charterers, and all winches to be at Charterers' disposal during loading and discharging; steamer to provide one winchman per hatch to work winches day and night, if required, Charterers agreeing to pay *$350.00 per month or pro rata in lieu of all overtime.*" (Emphasis supplied.)

3. "29. With reference to Line 25, the following cargoes are excluded: Livestock, asphalt and pitch in bulk, mahogany logs, arms, ammunition, explosives, ammonium nitrate, petroleum and petroleum products, *and other dangerous and/or injurious cargo,* but Charterers' privilege up to 500 tons dangerous/injurious cargo, provided packed, labeled and stowed in accordance with U. S. Coast Guard and National Cargo Bureau rules and regulations, and Charterers to pay $1,000.00 per month or pro rata while such cargo is on board, *as crew bonus.*" (Emphasis supplied.)

4. 46 U.S.C. § 170(7) (a).

5. 46 C.F.R. Sec. 146.03–8 (1961).
 "*A dangerous article within the meaning of the regulations in this subchapter is an article falling within any of the following classifications:*
 Explosives, Inflammable Liquids, Inflammable Solids and Oxidizing Materials, Corrosive Liquids, Compressed Gases, Poisons, Hazardous Articles, Ships' Stores and Supplies of a Dangerous Nature.
 For definitions covering these classifications see the appropriate section within this subchapter. * * *."

borings, shavings, turnings, cuttings". Included under this same classification as "hazardous" articles are: paper scrap, paper waste, treated textiles, treated paper, photographic flash lamps, hay, straw, hemp, excelsior, and other such material. Clearly indicated by Table K, in the language of the characteristic properties of metal borings, is an intention that only certain of this material is to be viewed as hazardous.[6]

The surveyor, in charge for the examining Bureau, testified that he issued his certificate of loading on this material in accordance with the regulations. He made the usual and customary investigation and did not find any condition which might possibly lead to trouble or create a hazard or danger to anyone. In other words, the temperature tests of the material conformed to the requirements of another part of Sec. 146.27–100, Table K.[7] On the record before me, I find that the cargo of scrap loaded on the SS NICTRIC was neither dangerous, injurious nor hazardous. This result follows, even though we read into the contract the statute and the rules and regulations promulgated thereunder.

█ Furthermore, it would seem that the particular provision was for the benefit of the crew, rather than the ship or the owner. Owners are not prosecuting the action as a "use plaintiff," for the benefit of the crew. Generally, a "crew" is the equivalent of the ship's company, and ordinarily embraces those who are naturally and primarily on board the vessel to aid in her navigation. Norton v. Warner Co., 321 U.S. 565, 64 S.Ct. 747, 88 L.Ed. 430 (1944). I find no authority which would include the ship, or the owner, within the meaning of the word. It follows that the bonus, if payable, is for the benefit of the crew, and that this claim should be abated, if not dismissed.

### Damages for Breach of Time Charter

█ Following the withdrawal of the NICTRIC from the Amtro charter, Owners drydocked the vessel in Tokyo for repairs until January 16, 1962, at 1700 hours. On January 13th, Owners re-chartered the NICTRIC to Orient Mid-East Line, which re-charter provided for hire at a lesser rate per ton than the original charter. The difference between the charter hire for the balance of the period under the Amtro time charter and the re-charter hire, amounts to $18,610.85. The fuel consumed taking the vessel from Tokyo to Bunbury is valued at $4,738.88. The port expenses on the voyage to Bunbury were $1,395.54, thus making a total of $24,745.27. The owner claims additional damages in the sum of $232.39 for crew overtime under Clause 23, while the vessel was en-route to Bunbury. Since Owners had withdrawn the charter from Amtro prior to the re-charter for the voyage to Bunbury, the charter provisions were no longer effective and the burden would be on Owners to show the actual overtime for which it was liable. No evidence was produced on this subject and the claim must fail. Owners, under the evidence and under the agreed facts, are entitled to judgment against Amtro for the additional sum of $24,745.27 for a breach of the time charter.

### Stevedore Damage

Amtro concedes that Owners are entitled to recover $500.00 on this item.

### Interest

█ Interest, at the rate of 6% per annum, is allowed to Owners on all awards from December 31, 1961, until paid, with the exception of the award against Amtro for breach of the charter. The amount of damages for the breach could not be determined until the vessel

---

6. *"Some* of these materials when shipped in bulk are subject to heating and spontaneous ignition."

7. "Before loading, temperature tests of the material should be taken at several points in the pile to determine if there is any heating. In the event the temperature is over 110° F., the shipment should be carefully watched. If the temperature rises to 130° F. or above, the material should not be accepted for transportation."

reached Bunbury. Therefore, interest at the rate of 6% per annum will be allowed on the damage award for breach of the charter from that date until paid.

Recognizing that Public Market Co. of Portland v. City of Portland, 171 Or. 522, 625, 130 P.2d 624, 138 P.2d 916 (1943), was not a proceeding in admiralty, I am of the belief that the thorough analysis of the subject of interest and the principles there stated, though not controlling, are highly persuasive. The rule stated is equitable, whether employed in admiralty or at common law. Maybe it should not be applied in all cases, but it sets a pattern to be here used.

## AMTRO'S CLAIMS AGAINST SCHNITZER

### Demurrage and Freight

■ A decision on these issues requires a proper construction, in the light of the trial record, of the language used by the parties in the voyage charter. The issue on demurrage grows out of a delay, in Japan, of approximately three months in the discharge of the vessel. The delay was principally due to congestion in the harbor and to the lack of scrap discharge facilities at the port in Japan. We start with the premise that where the time for the discharge of a vessel is stipulated or is definitely fixed by the charter or bill of lading, so that it can be calculated in advance, the charterer thereby agrees, without reservation, to discharge the vessel within that time, and takes the risk of all unforeseen circumstances. Likewise, it is immaterial

that the owner is prevented from doing its part of the work within the agreed time, unless it is in fault. In other words, the charterer takes the risk. St. Ioannis Shipping Corp. v. Zidell Explorations, Inc., 222 F.Supp. 299 (D.Or.1963), aff'd, 336 F.2d 194 (9th Cir. 1964).

Under the charter, Schnitzer agreed to load, stow and discharge the cargo within a total of 23 working days of 24 hours, Sunday and holidays excepted unless used, in which case actual time used was to count. Under the charter, the lay time expired on Monday, October 9, 1961, at 1218 hours. The demurrage was at the rate of $700.00 per day. The vessel was not discharged until December 31, 1961, at 0001 hours.

The principal defenses urged by Schnitzer are:

(1) That the voyage charter required Schnitzer to pay demurrage and the balance of the freight, *only* if Amtro was unable to exercise a lien on the cargo for the amount of demurrage and unpaid freight. Schnitzer claims that Amtro failed to exercise this right.[8] The language in the footnote was part of the *printed* form of the voyage charter. Amtro urges that Clause 18 of the *typewritten* endorsement to the printed form, dated July 14, 1961, is controlling.[9]

■ In the printed form, as originally conceived, it was only "merchants," i. e., cargo receivers, who, apart from Clause 8, were responsible for demurrage. Clause 8, in the printed form, merely added the liability of the charterers for

---

**8.** "8. Owners shall have a lien on the cargo for freight, dead-freight, demurrage. Charterers shall remain responsible for dead-freight and demurrage, incurred at the port of loading. Charterers shall also remain responsible for freight and demurrage incurred at port of discharge, but only to such extent as the owners have been unable to obtain payment thereof by exercising the lien on the cargo."

**9.** "18. Cargo is to be loaded, stowed and discharged within a total of twenty-three (23) weather working days of 24 hours.

Sundays and holidays excepted unless used, in which case actual time used to count. If longer detained, Charterers to pay demurrage at the rate stipulated in Clause 7 and payments to be made in the same currency as freight payment. If sooner despatched, Owners to pay despatch at the rate of THREE HUNDRED DOLLARS ($300.00) per day or pro rata for part of a day on laytime saved both ends and payments to be made in the same currency as freight payment. Charterers privilege to deduct brokerage and undisputed despatch from freight."

freight and demurrage.[10] Printed Clause 6, and part of printed Clause 7, placing liability for demurrage on "merchants" were deleted. Inserted between the deleted Clauses 6 and 7 is the typewritten language, "Demurrage, if incurred, to be paid by Charterers". Thus, in the typewritten provisions, the charterer has not only once, but twice, made an unqualified promise to pay the demurrage. Throwing further light on the subject is the language of typewritten Clause 18 requiring the charterer to make payments of the demurrage "in the same currency as freight payment." Under Clause 1 the amount of the freight must be paid in U. S. currency. Obviously, the requirement that payments of demurrage be made in United States currency would not have been inserted if the parties had intended an exclusive remedy of foreclosure and sale under the lien provision. Words deleted from a charter should be consulted to determine the intent of the parties. One Thousand Bags of Sugar v. Harrison, 53 F. 828 (3d Cir. 1893).

It is a fundamental rule of charter construction that the typewritten provisions take preference over the printed language. W. K. Niver Coal Co. v. Cheronea S. S. Co., 142 F. 402 (1st Cir. 1905); Hellenic Transport S. S. Co. v. Archibald McNeil & Sons Co., 273 F. 290 (D.Md.1921); Rothschild & Co. v. Robin Line S. S. Co., 26 F.2d 343 (9th Cir. 1928). Where, in the same charter, there exists both a specific and a general intent, the specific must prevail. American President Lines v. United States, 162 F.Supp. 732 (D.Del.1958), aff'd, 265 F.2d 552 (3d Cir. 1959). Here, we have specific language under which Schnitzer, without qualification, agrees to pay the demurrage. The form of the contract, the language used, the deletions made and the endorsement attached, are all chargeable to Schnitzer and, I so find under the undisputed evidence before me. Therefore, if ambiguity exists,

which I do not believe, all doubt must be resolved against the author of the charter. Thomas Jordan, Inc. v. Mayronne Drilling Mud, Chem. & Eng'r. Serv., 214 F.2d 410 (5th Cir. 1954). For that matter, the rule just stated is one of general acceptance. Schnitzer does not attempt to explain the typewritten modification of the printed form. Instead, its counsel argue the effect of the original lien clause, Clause 8, completely ignoring the typewritten modifications. Still casting aside the typewritten features of the charter, Schnitzer cites "Z" Steamship Co., Ltd. v. Amtorg, New York, 61 Lloyd's List L.R. 97 (1938). Before the court in that case was the language of Clause 8, without typewritten or other modification. Consequently, the expressions of the British Court in the construction of that charter, are here of no significance. The original Clause 8 was nothing more than the so-called "cesser clause" in the classic GENCON charter. Where such a clause is modified, as here, by the agreement of the parties, the modification prevails over the original clause. Crossman v. Burrill, 179 U.S. 100, 21 S. Ct. 38, 45 L.Ed. 106 (1900).

Aside from the views here expressed on the interpretation of the charter, I find a record which places Schnitzer in the indefensible position of first agreeing to pay demurrage, and later attempting to change its position. On November 13, 1961, when Schnitzer was first contacted by Amtro's counsel, after the vessel had been on demurrage for about one month, Schnitzer agreed to pay the demurrage, but objected to payment of that item and the balance of the freight until the completion of the discharge, on the ground that such items were not due under the charter until that time. This testimony of a Mr. Fletcher is uncontradicted. Subsequently, Schnitzer's counsel took the position that in fact there was no lien on the cargo for the demurrage. Schnitzer relied on this construction of

10. Clause 7 of the printed form which was stricken read:
 "7. Ten running days on demurrage at the rate of _____ per day or pro rata for any part of a day, payable day by day, to be allowed Merchants altogether at ports of loading and discharging."

the contract from about November 17th until after the cargo had been discharged on December 31st. On December 7th, counsel advised Amtro that it would not comply with what Amtro thought was a firm agreement to pay a portion of the demurrage and arbitrate the disputed amounts. At this time Amtro was advised to take whatever remedies it thought it might have. On December 11th, Amtro advised Schnitzer that it probably could not exercise a lien on the cargo on account of Japan's peculiar laws and of the fact that considerable of the cargo had been discharged. On December 14th, by the libel in this case, Owners advised Schnitzer that they had been unable to obtain payment of the demurrage by exercising a lien on the cargo. Until December 7th, it is quite clear that Schnitzer interpreted the contract in line with Amtro's and this Court's conclusions. A cable on August 11th indicated such an interpretation.[11] A letter to Amtro on August 27th applied the same construction.[12] One week later in an inter-office memo to its Tokyo office, Schnitzer conformed to the same interpretation.[13] The record clearly shows that the indicated "small fortune" was the sum being lost on demurrage. On all contracts with purchasers at the ports of discharge, the demurrage was for the sellers, i. e., Schnitzer's account, with one exception. At Okaya, one purchaser agreed to pay his proportionate share of demurrage.

▉▉▉▉▉ Not to be overlooked, on this point, is the general rule that the acts of the parties under a contract, before disputes arise, are the best evidence of the meaning of doubtful terms. Brown v. Cowden Livestock Co., 187 F.2d 1015 (9th Cir. 1951); Sam Macri & Sons, Inc. v. United States, 313 F.2d 119 (9th Cir. 1963); Interstate Plywood Sales Co. v. Interstate Container Corp., 331 F.2d 449 (9th Cir. 1964). Likewise, the attitude of one of the parties to a contract as shown by his acts or declarations is entitled to weight in construing the contract. United Steel Workers v. Northwest Steel Rolling Mills, 324 F.2d 479 (9th Cir. 1963); Minnesota Mut. Life Ins. Co. v. Wright, 312 F.2d 655 (8th Cir. 1963).

▉▉▉ Schnitzer's argument that Amtro made no attempt to enforce payment of the demurrage by exercising a lien is simply without foundation. The record clearly shows that attempts were made, by Amtro, even to the extent of trying to obtain lighters from stevedoring companies with which to discharge the cargo into the custody of the owners' agents, only to be told by the stevedores that no lighters were available. Schnitzer argues that the cargo could have been retained on board the vessel. In such case, the ship risked not only the possibility, but also the probability, of being moved by the harbor authorities and sent to anchor outside to await another turn at discharge. Some 50 to 100 ships were waiting for months for a turn at a berth. The obvious concern of the harbor authorities was to get the ships in, discharged and away. The statutory lien in Japan, even if applicable, could not be exercised in the present case, under these facts, for the reason that the consignees had transferred the title to third persons and third persons acquired possession of the goods. The only lien that Amtro could exercise was the possessory lien given under the charter. If, under these circumstances, Amtro or Owners had claimed a possessory lien, the harbor authorities would justifiably have had little patience and would probably have ordered the ship to again take its turn at the end

---

11. "* * * EXTREMELY CONCERNED ABOUT NICTRIC DEMURRAGE AT YOUR END AS THIS VESSEL WILL DISCHARGE OSAKA/TOKYO BOTH IF DELAYED BOTH PLACES WE COULD HAVE TREMENDOUS DEMURRAGE BILL * * *."

12. "We have been losing heavily on several of our vessels because of these delays, and needless to say, we are as anxious as you to complete same."

13. "We are losing a small fortune on this vessel. Would appreciate some answers. Anything you can do to expedite the matter will be of tremendous help."

of the line. *Query:* Would not, purchasers, under those circumstances, be uninformed and remarkably immature, to bid at a judicial sale?

As an alternative, Schnitzer suggests that the NICTRIC could have been moved to another wharf and the lien exercised there. The record does not support this contention. Schnitzer's agent tried to put the vessel in at this particular wharf, but could not do so on account of the nature of the vessel's scrap. The scrap could not be discharged in seven days, and, therefore, was not eligible for space at the particular wharf. Here, again, it was obvious that the port authorities were particularly anxious to get the ships in, discharged and under way.

In further avoidance, Schnitzer suggests that other areas could have been bonded for the storage of scrap iron. Directly contrary to this contention is the report prepared by Schnitzer's agent, Pacific Marine Corporation, which shows that "every inch of shore property within customs bonded areas (and there is precious unoccupied land of any kind in this country especially in the port areas of cities) is long since jammed with cargo; schemes have been tried to station ships; every smaller port has been surveyed to see whether it can receive ocean cargo or lend lighters, et cetera, but every effective means has been apparently exhausted." On this point, Schnitzer's position is again without support.

In a final assault, Schnitzer charges that Amtro and Owners could have retained possession of the cargo on the lighters into which it was discharged, on the theory that while it was in the lighters it was in the possession of the consignees. It is crystal clear that the port authorities would never permit the use of lighters, then in extreme shortage, to be used for storage while the lien was being foreclosed. There is no more reason to believe the port authorities would permit this type of delaying action, than they would permit a vessel to remain at anchor in the harbor and retain its turn while the lien was being foreclosed. The suggestion is without merit. It is my

conclusion on the evidence that Japan has a lien law that might be exercised in the hands of consignees within two weeks after delivery, but that such law was not applicable to the facts in the present case for the obvious reason that the scrap was delivered to persons other than the consignees and that Amtro was not in a position to effectively assert its lien on account of the representations of Schnitzer that the demurrage and unpaid freight would be paid. Even if Clause 8 remained in full force and effect, not modified by the typewritten language, the provision with reference to the exercise of the lien being the sole remedy, it should not be enforced on the record before me.

## AMOUNT OF DEMURRAGE

A partial defense urged by Schnitzer against the claim for demurrage is that demurrage was not to be charged for the period from Saturday noon until 8:00 A. M. Monday and from midnight preceding a holiday until 8:00 A. M. the day after the holiday, unless used. Once the lay days have expired, as a general rule, the vessel is on demurrage and the demurrage days run continuously. In such case, it is held, the exception of Sundays, holidays, strikes, etc., is no longer of value. Poor, Charter Parties and Bills of Lading Sec. 49. Berwind-White Coal Mining Co. v. Solleveld, Etc., 11 F.2d 80, 82 (4th Cir. 1926).

The charter provisions with reference to lay days and demurrage are clear. The exceptions with reference to Saturdays and other holidays had no application after the lay time expired. Even if ambiguous, the charter, as previously mentioned, must be construed against Schnitzer, its author. Manifestly, Schnitzer, the voyage charterer, was desperately in need of cargo space to transport its scrap metal to Japan. Aware, at least to some extent, of the congested harbor conditions in that area, it was compelled to modify the customary charter and take its chances on discharge within the lay time in Japan. It is my finding and conclusion that Owners and

Amtro are entitled to judgment against Schnitzer for demurrage in the sum of $57,757.10, plus the sum of $4,550.00 for unpaid freight under the voyage charter, with interest as indicated aforesaid.

## EXTRA EXPENSES

Clause 1 of the voyage charter provides, among other things: "Any extra expenses incurred by reason of nature of cargo and of metallurgical expert to be for charterers account * * *." Amtro points to this language in support of its claim for extra expenses incurred while the NICTRIC was delayed in Japan. While the record discloses that a scrap cargo, such as was carried by the NICTRIC was not favored in the discharging scheme in Japan, it does not support a finding that the total day, or any specific part thereof, was due to the nature of the cargo. Furthermore, it would require the imagination of a leprechaun to extend this language to cover a situation where a ship carrying scrap was compelled to wait longer to obtain a berth than ships carrying other kinds of cargo. Obviously, the "extra expenses" mentioned in this clause refer to those expenses, if any, directly incurred in loading, transporting or discharging the scrap. Likewise, the fundamental purpose of demurrage is to make an adequate allowance or compensation for the delay or detention of the vessel. The Conqueror, 166 U.S. 110, 17 S.Ct. 510, 41 L.Ed. 937 (1897); Continental Grain Co. v. Armour Fertilizer Works, 22 F.Supp. 49, 54 (S.D.N.Y.1938); The Apollon, 9 Wheat. 362, 22 U.S. 362, 376, 6 L.Ed. 111 (1824); W. R. Grace & Co. v. Hansen, 273 F. 486, 496 (9th Cir. 1921). The claim for alleged extra expenses is denied.

## FRAUD

Schnitzer challenges the jurisdiction of the Court to hear the fraud issue. I disagree. Where the first and fundamental exercise of judicial power is purely maritime in nature, and the issue of fraud arises as an incidental to the Court's general admiralty jurisdiction, the Court may deal with the question of fraud, even though such question may be intrinsicly nonmaritime. This rule is based on the theory that the court has power to make a complete adjustment of rights over which admiralty has independent jurisdiction. Putnam v. Lower, 236 F.2d 561 (9th Cir. 1956); Swift & Co. Packers v. Compania Colombiana Del. Caribe, 339 U.S. 684, 70 S.Ct. 861, 94 L.Ed. 1206 (1950); Archawski v. Hanioti, 350 U.S. 532, 76 S.Ct. 617, 100 L.Ed. 676 (1956). Furthermore, all of the necessary elements of a diversity case are present on the issue of fraud, here presented.

The representations on which Amtro principally relies are:

(1) That Leonard Schnitzer assured Captain Jensen that there would be no delay on the discharge of the vessel in Japan, because of Schnitzer's association and control over the discharge on delivery of the cargo in that nation;

(2) That Captain Jensen, as agent for Schnitzer, represented that as of July 14, 1961, there was approximately 10 days delay in discharging, but that by the time the vessel arrived there would be no delays;

(3) That Maurice Schnitzer represented that there would be no delays to Amtro in regard to the loading and discharge within the 23 weather working days mentioned in the agreement; that at that time there was some delay, but by the time the vessel arrived there would be no delays.

Assuming, *arguendo*, that Sea Charter was the agent of Schnitzer and that Captain Jensen's declarations were binding on Schnitzer, it remains a fact that Amtro has failed in its charges of fraud. The record is in such a state of confusion that I cannot affirmatively say that Amtro has carried its burden of proof and established its charges of fraud by a preponderance of the evidence. Worthy of observation is the nature of the alleged fraudulent representations. At best, they are but predictions or promises to do something in the future.

172

Such a representation cannot be made the basis of fraud. Fraud, to be actionable, must relate to a present or preexisting fact, and may not be predicated upon representation as to matters which are to happen in the future. Pacific Royalty Co. v. Williams, 227 F.2d 49 (9th Cir. 1955), cert. denied, 351 U.S. 951, 76 S.Ct. 847, 100 L.Ed. 1474 (1956); Moser v. New York Life Ins. Co., 151 F.2d 396 (9th Cir. 1945). If Oregon law applies the same rule is employed. Hansen v. Holmberg, 176 Or. 173, 156 P.2d 571 (1945); Smith v. Owen, 208 Or. 154, 300 P.2d 423 (1956); Butte Motor Co. v. Strand, 225 Or. 317, 358 P.2d 279 (1960). Expressions of opinion are not actionable. This is not a case where the evidence would indicate that the promisor knew, at the time of the promise, that it could not be fulfilled. Amtro has failed to carry the burden on its charges of fraud.

## CONSEQUENTIAL DAMAGE

This demand is an alternative to the claim for fraud. Amtro urges that Schnitzer's refusal to pay the balance of the freight and demurrage, when due, caused the withdrawal of its time charter, and as a result consequential damage was inevitable. To be conceded is the fact that judgment in the sum of $24,-745.27 and interest is being allowed to Owners as damages for breach of the time charter. The issue presented is whether Schnitzer is liable in whole, or in part, for this or other loss.

 After a complete analysis of the evidence before me, I do not believe that it would support a finding that either Amtro or Schnitzer contemplated the long delay which was incurred at the ports of discharge, nor could Schnitzer contemplate that its failure to pay demurrage would result in a withdrawal of the charter and consequential damages as herein fixed. As a general rule, under a charter such as this, the amount fixed as demurrage, and interest allowed thereon, fixes the amount of damages. Globe Refining Co. v. Landa Cotton Oil Co., 190 U.S. 540, 23 S.Ct. 754, 47 L.Ed. 1171 (1903); Poor, Charter Parties & Ocean Bills of Lading Sec. 82; Earnline S. S. Co. v. Manati Sugar Co., 269 F. 774 (2d Cir. 1920). This record does not support the allowance of consequential damages to Amtro, in addition to demurrage.

Summarizing, Owners are entitled to judgment against Amtro for the balance of the charter hire, to-wit: $21,530.89, the further sum of $1,658.41 for crew overtime, the further sum of $500.00 as stevedore damage, and the further sum of $24,745.27 for breach of the time charter. Interest at the rate of 6% per annum is allowed on all of the awards from December 31, 1961, until paid, with the exception of the award for breach of charter. On that amount, interest will be allowed at the rate of 6% per annum from the date the vessel reached Bunbury, Australia.

Owners, as garnisher to the extent of its judgment, and Amtro will be awarded judgment against Schnitzer for the sum of $57,757.10, as demurrage, and the further sum of $4,550.00 for unpaid freight, and the further sum of $500.00 as stevedore damage, together with interest at 6% from December 31, 1961.

The foregoing shall serve as my findings and conclusions. Additional findings may be requested. Proctors for libelant and respondents shall prepare, serve and present a conforming decree. Libelant, respondents and cross-libelant are entitled to customary costs and disbursements.