620 F.Supp. 121 (1985)
SUN REFINING AND MARKETING COMPANY, a Pennsylvania Corp., Plaintiff,
v.
GOLDSTEIN OIL COMPANY, and Novelly Oil Company, Missouri Corporations, General Partners of Apex Oil Company, a Missouri General Partnership, Defendants.
No. 82-600A(5).
United States District Court, E.D. Missouri, E.D.
April 16, 1985.
*122 Christopher F. Jones, St. Louis, Mo., for plaintiff.
Richard H. Ulrich, Lee G. Kline, David L. Baylard, St. Louis, Mo., for defendants.

MEMORANDUM
LIMBAUGH, District Judge.
This case is before the Court for a decision on the merits following a three-day bench trial. Plaintiff has asserted three claims against defendants, one for demurrage charges, one for freight charges, and the last for breach of contract for a short payment on a sale of toluene. The first two claims are maritime claims brought pursuant to this Court's admiralty jurisdiction. 28 U.S.C. § 1333. The last claim is brought under the Court's diversity jurisdiction. 28 U.S.C. § 1332. After consideration of the testimony adduced at trial, the exhibits introduced into evidence, the briefs *123 of the parties and the applicable law, the Court hereby makes the following findings of fact and conclusions of law, as required by Rule 52 of the Federal Rules of Civil Procedure.
Plaintiff, Sun Refining and Marketing Company (SRMC), is a Pennsylvania corporation with its principal place of business in the State of Pennsylvania. SRMC is the successor corporation to Sun Oil Company of Pennsylvania (SOCP), formerly a Pennsylvania corporation with its principal place of business in the State of Pennsylvania. At all relevant times, Sun Petroleum Products company (SPPC) was a division of SOCP.
Defendants Goldstein Oil Company and Novelly Oil Company are Missouri Corporations with their principal place of business in the State of Missouri. Goldstein Oil and Novelly Oil are general partners of the Apex Oil Company (Apex), a Missouri general partnership with its principal place of business in the State of Missouri.

$75,095.95 Demurrage Claim
On December 12, 1980, Apex entered into an oral agreement to purchase approximately 200,000 barrels of 2.8 sulphur Number 6 fuel oil at $29.95 per barrel from SPPC. The broker that negotiated the purchase between SPPC and Apex was Triad Petroleum Company (Triad). The custom of the petroleum industry in general and between SPPC and Apex, in particular, was to confirm oral contracts to purchase and to sell petroleum products by having the purchaser and the seller send telexes to the broker. The broker would then relay the purchaser's telex to the seller and the seller's telex to the purchaser.
As for the delivery of the cargo, SPPC's telex to defendant stated: "DELIVERY: To buyer's designated terminal USNH Base Norfolk on vessel New Jersey Sun ETA 12/15/80. Second port permitted with all costs for buyer's account". The telex the broker sent to SPPC on behalf of Apex stated: "DELIVERY: Delivered USNH Basis Norfolk during the period December 15, 1980." Both telexes provided that the laytime, the free time that a vessel is detained for loading or unloading, would be thirty-six hours plus six hours after Notice of Readiness (NOR).
The demurrage clause in SPPC's telex to Apex stated in pertinent part: "DEMURRAGE: The amount of demurrage paid to vessel owner shall be: at worldscale rate of particular size/type vessel for spot charter and if time charter at AFRA rate ...". The demurrage clause in Apex's telex to SPPC stated: "DEMURRAGE: In accord with the fixing rate of the vessel." The evidence at trial showed that Sun Transport, Inc. was at all relevant times the owner of the vessel S.S. New Jersey Sun.
The New Jersey Sun arrived in the harbor at Norfolk, Virginia, on December 15, 1980, at 9:33 p.m. The vessel anchored in the harbor at that time and awaited Apex's discharge orders. Phillip Liles, the tanker scheduler for Apex Oil at the time, notified Henry Reid, chief negotiator for Apex in the sale, that the New Jersey Sun had arrived in Norfolk harbor on the fifteenth. Joe DiMauro, an employee of Triad, stated that the contract between SPPC and Apex reflected Apex's ability to receive the cargo on December 15, 1980. Henry Reid admitted that he knew the area in which the New Jersey Sun would be on December 15, was the Norfolk area since he knew the barge left its port in Puerto Rico on December 12, 1980.
On December 17, Apex then ordered the ship to go to Savannah, Georgia, to discharge the crude at three berths. The vessel left Norfolk at 11:55 p.m. on the seventeenth and arrived in Savannah at 9:30 a.m. on December 19. The master of the vessel tendered a formal NOR to Koch Fuels in Savannah on December 19, 1980. The NOR was received at 6:30 p.m. The vessel had discharged the cargo contracted for by 11:20 a.m. on December 21.
The total amount of time the New Jersey Sun spent in Norfolk was fifty hours and twenty-two minutes. The time spent in Savannah, less the time spent at anchor and shifting to the first berth, was forty-two hours and twenty-five minutes. The *124 total time spent in Norfolk and Savannah amounted to ninety-two hours and forty-seven minutes. Upon subtracting the allowance for laytime, plaintiff seeks to recover fifty-six hours and forty-seven minutes or 2.365972 days for demurrage.
Apex received plaintiff's invoice with the attached laytime statement and port log sometime in February, 1981. Apex has refused to pay the amount of the demurrage charges plaintiff claims was incurred, specifically $75,095.95. Consequently, plaintiff brought this action against Apex.
Plaintiff's claim is made within the admiralty jurisdiction of this Court. 28 U.S.C. § 1333; Compagnia Di Navigazione Mauritius Rome v. Kulukundis, 182 F.Supp. 258 (E.D.N.Y.1959).
When a party charters a vessel, it is allowed a certain amount of time to unload the vessel. The time allowed is referred to as laytime. After the laytime has expired, the vessel owner is entitled to receive demurrage charges. The purpose of demurrage is to make compensation for delay or detention of a vessel. Cia. Blanca Ltda. v. S.S. Nictric, 247 F.Supp. 161 (D.Or.1965), aff'd. Schnitzer Steel Products Co. v. Amtro Corp., 368 F.2d 575 (9th Cir.1966).
Defendant asserts that plaintiff has no standing to assert the demurrage claim against Apex. The demurrage clause contained in plaintiff's telex stated that any demurrage charges shall be paid to the vessel owner. The demurrage clause in defendant's telex was not as clear, but still left the inference the charges, if any, were to be paid to the vessel owner. Demurrage charges are normally paid to the owner of the vessel since "time is always of direct and vital financial significance to the owner [of the vessel]." G. Gilmore and C. Black, The Law of Admiralty, 2d ed., § 4-8 at 210 (1975). There is no evidence to show plaintiff was ever the owner of the vessel.
However, plaintiff can still be deemed the real party in interest if it can show that Sun Transport, Inc., the admitted owner of the vessel involved, had either assigned or subrogated its demurrage claim to plaintiff's predecessor. Both subrogation and assignment are cognizable in admiralty. American Commercial Lines, Inc. v. Valley Line Co., 529 F.2d 921, 925 (8th Cir.1976). The evidence adduced at trial showed that plaintiff, SRMC, had received a demurrage calculation from Sun International, Inc., in the amount which SPPC then charged Apex. However, SRMC has not shown that the demurrage charges were either paid by it, or assigned to it. Plaintiff also did not show that the parties had agreed that the demurrage charges, if any, were to be paid by the buyer to the seller. Therefore, since plaintiff has not proven the loss it alleges that it incurred, judgment will be entered for defendant on the demurrage claim.

$8,325.04 Claim
Plaintiff's second claim against defendants is an account stated claim for freight charges. Plaintiff's claim arises from an agreement where the vessel the Toledo Sun would transport approximately 35,000 barrels of gasoline from plaintiff's terminal in Newark, New Jersey, to Apex's designated place of discharge in New York Harbor at B & P Tremley Point in Linden, New Jersey.
Prior to August 9, 1980, SPPC and Apex entered into an oral agreement. The agreement stated that Apex agreed to pay SPPC freight charges at the rate of $.23 per barrel in exchange for SPPC transporting the 35,000 barrels of gasoline on the Toledo Sun for defendant. SPPC sent written confirmation of the agreement to Apex on August 9, 1980.
On the ninth of August, SPPC transported 36,195.81 barrels of Apex's regular gasoline via the barge, The Toledo Sun, from Sun's terminal in Newark to Apex's designated place of discharge berth at B & P Tremley Point.
As summarized in the Toledo Sun's deck abstract, the freight incurred for Apex's account equalled $8,325.04. (36,195.81 barrels unloaded at discharge × $.23 per barrel equals $8,325.04). Apex received SPPC's invoice, plus copies of the deck *125 abstract and the original confirmation around September 9, 1980. Apex has refused to pay any part of the invoice SPPC sent them.
This case is brought pursuant to this Court's admiralty jurisdiction 28 U.S.C. § 1333; Hapag-Lloyd, A.G. v. Levine, 473 F.Supp. 991 (N.D.Ill.1979).
A shipper who agrees to pay a carrier freight for transporting the shipper's goods to a designated place of delivery is liable to the carrier for the stipulated freight when the goods have been delivered. Hapag-Lloyd, A.G. v. Levine, supra, at 992-93. To recover freight from the shipper, the carrier need only show the evidence of the agreement and performance of the agreement. According to the foregoing findings of fact, defendant is obligated to pay the $8,325.04 freight charge owed to plaintiff. Judgment will be entered for plaintiff on Count IV of its second amended complaint.

$40,487.68 Claim
The last of plaintiff's claims concerns the purchase of the petroleum product toluene. On July 22, 1981, SPPC and Apex entered into an oral agreement negotiated by Jim Amaroso of SPPC and John Samsel of Apex. According to the terms of the agreement, SPPC was to sell to Apex approximately 20,000 barrels of toluene at $1.28 per gallon. Delivery was to be FOB plaintiff's Marcus Hook Refinery. Neither Samsel or Amaroso mentioned how the inspection or measurement of the loaded toluene was to be performed while negotiating the agreement.
On July 23, 1981, John Samsel sent Jim Amaroso Apex's product purchase agreement to confirm the sale. Apex's confirmation provided for independent inspection of shore tank readings at loading, but was silent on how the loaded quantity was to be measured if shore tank readings at loading were unavailable or were inaccurate. On July 31, 1981, Jim Amaroso returned Apex's confirmation unsigned with SPPC's confirmation of sale form. SPPC's confirmation did not address the question of how the toluene was to be measured.
If the independent inspection or shore tank readings were unavailable at the time of loading, trade usage allowed for the loaded quantity to be based on independent inspection of barge readings at loading. If the inspection of the barge readings were not available, then the inspector could use whatever other measurements at loading that he deemed most reliable to determine the quantity to toluene delivered at loading. There was no trade usage calling for the loaded quantity to be based on shore tank readings at discharge in the absence of shore tank readings at loading. In any event, Jim Amaroso, Acting on SPPC's behalf, did not agree to accept payment from Apex based upon the shore tank readings at loading.
On August 29, 1981, SPPC delivered 937,336 gallons of toluene into Apex's barge, the Ocean Trader. An independent inspection company, Charles Martin, certified the amount delivered to Apex in its final inspection report as 937,336 gallons. The certification was based on measurements of the Ocean Trader at loading. The inspection company was hired by both SPPC and Apex to certify the quantity delivered to Apex. The inspector did not take shore tank measurements at loading because the shore tanks in which the toluene was stored could not be measured as accurately as the receiving barge.
The inspector's initial loaded quantity figure was 956,893 gallons. The inspector later mathematically adjusted the final loaded quantity figure to 937,336 gallons, using the Sagbolt experience factor for the Ocean Trader.
SPPC then sent Apex the invoice for the delivery of toluene around September 4, 1981. On October 15, 1981, Apex short-paid the product portion of the September 4th invoice by $40,487.68. The October 15th payment was SPPC's first notice of any objection by Apex to the loaded quantity figure of 937,336 gallons.
*126 Maritime obligations in contracts for the sale of goods may be enforced in admiralty. Klosters Rederi Aktieselskab v. Amtorg Trading Corp., 7 F.Supp. 727 (S.D.N.Y.1934). However, maritime provisions must be separable and capable of litigation without reference to the balance of the sales contract. Tropwood, A.G. v. Tae Chang Wood Industry Co., 454 F.Supp. 964,966 (N.D.Ill.1978). The claim before the Court is based in part on maritime usage, but the trade usage issue cannot be litigated without reference to the balance of the sales contract. Therefore, plaintiff's claim arises within the diversity jurisdiction of this Court. 28 U.S.C. § 1332.
The Uniform Commercial Code (UCC) which governs contracts for the sale of goods, may be relied on by a federal court analyzing an admiralty contract. Sun Oil Co. v. Mercedes Maria, 1983 A.M.C. 718, 723 (E.D.Pa.1983).
Under § 400.2-207, R.S.Mo. (1983 Supp.), the terms of the SPPC confirmation became a part of the agreement between SPPC and Apex. Section 400.2-207 provides that any additional terms in a written confirmation become a part of the contract unless: (a) the offer expressly limits acceptance to the terms of the offer; (b) they materially alter it; (c) notification of objection to them has already been given or is given within a reasonable time after notice of them is received. None of the three exceptions occurred in the matter now before the Court.
The sales contract between SPPC and Apex consisted of the quantity, price and delivery terms to which SPPC and Apex agreed to on July 22, 1981. Additionally, the contract also contained the nonconflicting terms of the Apex written confirmation and the SPPC written confirmation. § 400.2-207, R.S.Mo. (1983 Supp.).
Another term in the contract was provided by trade usage which required the buyer to pay for the loaded quantity of toluene based upon an independent inspection of barge measurements at loading if independent inspection of shore tank measurements at loading was not feasible. § 400.2-202(a), R.S.Mo. (1983 Supp.). Therefore, by having established that it delivered 937,336 gallons of toluene to Apex at loading in accordance with their agreement and that Apex did not pay for 31,631 gallons of the toluene delivered, SRMC is entitled to judgment in its favor on Count IX of its second amended complaint in the amount of $40,487.68.